**2023 UT App 100**

# THE UTAH COURT OF APPEALS

THERESA CHRISTENSEN,
Petitioner,
*v.*
LABOR COMMISSION AND SALT LAKE COUNTY,
Respondents.

SALT LAKE COUNTY,
Petitioner,
*v.*
LABOR COMMISSION AND THERESA CHRISTENSEN,
Respondents.

Opinion
No. 20200391-CA
Filed August 31, 2023

Original Proceeding in this Court

Russell T. Monahan, Attorney for Theresa
Christensen

Sean D. Reyes, Erin T. Middleton, and Scott G.
Higley, Attorneys for Labor Commission

Simarjit S. Gill and D. Adam Miller, Attorneys for
Salt Lake County

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGE RYAN D. TENNEY concurred. JUSTICE JILL M.
POHLMAN concurred in part and dissented in part, with
opinion.[1]

---

1. Justice Jill M. Pohlman began her work on this case as a member
of the Utah Court of Appeals. She became a member of the Utah
Supreme Court thereafter and completed her work on the case
sitting by special assignment as authorized by law. *See generally*
Utah R. Jud. Admin. 3-108(4).

CHRISTIANSEN FORSTER, Judge:

¶1     Theresa Christensen petitioned for judicial review of various aspects of the Labor Commission Appeals Board's (the Board) order awarding her compensation in connection with her retaliation claim against Salt Lake County (the County). The County also petitioned for judicial review, asking that we set aside the Board's determination that the County had retaliated against Christensen or, in the alternative, that we set aside the Board's award of various remedies to Christensen. We largely uphold the Board's decision on retaliation but set aside its order reinstating Christensen and denying her request for attorney fees, and we remand for further proceedings consistent with this opinion.

BACKGROUND

¶2     Christensen began working for the County in 1988 and started working as a fiscal coordinator around 2013. From 2011 to 2014, Christensen received above-average performance evaluations (she did not receive an evaluation in 2015). In July 2016, the County hired a new fiscal manager (Supervisor), who was assigned to supervise Christensen.

¶3     In the first meeting between Christensen and Supervisor, Supervisor made several comments about Christensen's physical appearance that made her feel uncomfortable. Soon after, Christensen began to notice that Supervisor was closely monitoring her, walking past her office several times a day and looking in her office window. Coworkers observed Supervisor following Christensen on her breaks and her lunch hour. Supervisor later explained that the monitoring was based on deficiencies in Christensen's work: he had noticed some errors in how she was processing payments, observed her frequently socializing, and noticed that she often disappeared in the afternoons. On August 26, 2016, Supervisor sent Christensen an

email directing her to move her desk, keep her office door open, and keep the blinds on her windows open.

¶4      In September, Supervisor raised concerns with overtime hours Christensen had recorded while working from home. Supervisor began drafting a performance improvement plan for Christensen. Also in September, Christensen contacted her union representative about Supervisor's behavior. On September 30, the union representative joined Christensen for a meeting with Supervisor and informed Supervisor that Christensen was uncomfortable with the monitoring. The union representative also attended subsequent one-on-one meetings between Supervisor and Christensen. Supervisor's monitoring and investigation of Christensen continued. However, he did not make any more inappropriate comments about Christensen's appearance.

¶5      On November 1, the union representative met with Supervisor's supervisor (Boss) to discuss the inappropriate comments and monitoring. Boss did not share this information with human resources but instead spoke to Supervisor about Christensen's complaints. Supervisor remained in place as Christensen's supervisor but was directed not to be alone with her, and Boss arranged for another person to attend meetings between Christensen and Supervisor.

¶6      On December 20, Supervisor met with Christensen and her union representative to give Christensen her annual performance evaluation. Supervisor gave her a score of 2.15 out of 5 for the period of July to December. Christensen appealed the score to Boss, who, on January 13, 2017, directed Supervisor to raise the score to a 3, which would make Christensen eligible for her annual raise.

¶7      On January 12, Boss sent Christensen an email asking her to stop discussing Supervisor's behavior with other employees. Boss accidentally sent this email to Supervisor as well. On January

17, Christensen filed an equal employment opportunity (EEO) complaint with the County, alleging sexual harassment and retaliation. That same day, Supervisor issued a written warning to Christensen regarding her altering her schedule without approval in September, October, and December of 2016. However, it is unclear from the record which of these events occurred first.[2]

¶8    On January 24, Christensen attended a staff meeting where Supervisor distributed copies of two documents that contained mistakes, which were created by Christensen and had her name on them. On January 30, Christensen called in sick; her doctor had advised her not to return to work until February 3. But Supervisor directed her to complete work from home while she was ill.

¶9    On February 15, Supervisor brought a large pile of papers to Christensen's office related to her purchase-card activity in 2016. When Christensen later was asked to provide information to be reviewed by an auditor, she observed "that her file had been marked with red annotations showing errors and that none of her coworkers' files had similar annotations."

¶10    On March 21, Christensen filed a complaint against the County with the Utah Antidiscrimination and Labor Division (UALD), alleging discrimination, sexual harassment, and retaliation under the Utah Antidiscrimination Act (the UAA).

¶11    On May 3, at her doctor's recommendation, Christensen took leave pursuant to the Family and Medical Leave Act (FMLA) due to stress. While on FMLA leave, she used 920 hours of

---

2. The Board found that the EEO complaint was made "early in January 2017," and its findings appear to reflect a misconception that the EEO complaint predated the written warning to Christensen. However, the complaint itself is dated January 17, 2017, the same day Christensen received Supervisor's written warning.

vacation and sick leave pay she had accumulated. Once her leave balances were exhausted on October 15, 2017, Christensen decided to retire rather than return to work. In doing so, she purchased a year of service credit by rolling over funds from her retirement account to increase the value of her pension.

¶12    On August 22, 2018, the County issued Supervisor a Notice of Intent to Terminate stemming from instances of inappropriate workplace behavior with various other employees. Supervisor resigned in lieu of termination.

¶13    On June 1, 2018, the UALD issued an order finding no reasonable cause for Christensen's claims of discrimination and retaliation. Christensen filed a Notice of Appeal with the Labor Commission. The case went before an administrative law judge (ALJ) for a hearing. Following the hearing, the parties received notice that the ALJ had been replaced by a different ALJ, Judge Newman, who—without conducting any additional proceedings—issued findings, conclusions, and an order on September 5, 2019. Judge Newman found that Christensen had failed to prove either discrimination or retaliation or that she was constructively discharged.

¶14    On October 1, 2019, Christensen filed a Motion for Review with the Board. In her motion, Christensen challenged the substitution of the ALJ, Judge Newman's determination that she did not suffer retaliation, and the determination that she was not constructively discharged.[3] Although the Board acknowledged the post-hearing substitution of the ALJ was "unusual," it concluded that Christensen had not shown she suffered prejudice as a result of the substitution. The Board also agreed with Judge Newman's determination that Christensen failed to demonstrate that she had been constructively discharged. However, the Board set aside Judge Newman's decision dismissing Christensen's

---

3. Christensen did not challenge Judge Newman's rejection of her discrimination claim.

retaliation claim because it agreed with Christensen that the County had retaliated against her for complaining about Supervisor's unwelcome comments on her appearance and behavior toward her. It therefore sent the matter back to Judge Newman for further proceedings.

¶15    Upon remand, Judge Newman undertook to craft an appropriate remedy for Christensen based on the Board's finding of retaliation. After reviewing the evidence, Judge Newman (1) reinstated Christensen's employment; (2) awarded her back pay and benefits from the time of her retirement on October 16, 2017, until the date of the decision; and (3) ordered that the County reimburse the amount she took out of her retirement account to purchase an extra year of service credit. However, Judge Newman denied her request for reimbursement of her vacation and sick leave pay and her request for attorney fees.

¶16    Both Christensen and the County asked the Board to review Judge Newman's decision. The Board set aside Judge Newman's award of back pay. Additionally, contrary to Judge Newman's decision, it determined that Christensen was entitled to the value of the vacation and sick leave she used between May 24, 2017, and October 15, 2017. It upheld Judge Newman's order of reinstatement, reimbursement of the retirement funds, and denial of attorney fees.

¶17    Christensen then petitioned this court for judicial review of the Board's decision, and the County also petitioned for review.

ISSUES AND STANDARDS OF REVIEW

¶18    First, the County challenges the Board's determination that it retaliated against Christensen in violation of the UAA. We grant deference to the Board's factual findings and will not set them aside unless they are not supported by substantial evidence. *See Provo City v. Utah Labor Comm'n*, 2015 UT 32, ¶ 8, 345 P.3d 1242.

However, we review the Board's application of the legal standard for correctness. *See id.* ¶ 17.

¶19   Next, both the County and Christensen raise various challenges to the remedies ordered by the Board, which require us to interpret Utah Code section 34A-5-107(8), addressing remedies under the UAA. "The Labor Commission's interpretation of a statute is a question of law, which we review for correctness." *Rueda v. Utah Labor Comm'n*, 2017 UT 58, ¶ 18, 423 P.3d 1175 (quotation simplified). Christensen also challenges the Board's determination that it could not award attorney fees because doing so would be an unconstitutional regulation of the practice of law. We review constitutional issues for correctness. *See Salt Lake City Corp. v. Jordan River Restoration Network*, 2012 UT 84, ¶ 47, 299 P.3d 990.[4]

ANALYSIS

I. Retaliation

¶20   We first review the County's argument that the Board's retaliation finding was not supported by substantial evidence and that the Board erred in concluding that the County retaliated against Christensen.

---

4. Christensen also challenges the Board's determination that she was not prejudiced by the substitution of the ALJ. But because Christensen prevailed on her retaliation claim before the Board and we uphold the Board's determination on appeal, we agree with the County that she cannot show that she suffered prejudice as a result of the substitution. Therefore, we do not address this argument further. *See* Utah Code § 63G-4-403(4) (providing that the court shall grant relief "only if" it determines that a party has been "substantially prejudiced" by the agency's error).

¶21    Under the UAA, it is a prohibited employment practice for an employer to "retaliate against, harass, or discriminate in matters of compensation or in terms, privileges, and conditions of employment against a person otherwise qualified, because of" race, sex, age, or national origin. Utah Code § 34A-5-106(1)(a)(i). "[T]he legislature intended the [UAA] to address all manner of employment discrimination against any member of the specified protected groups . . . [and] included employer retaliation for complaining of employment discrimination within its definition of discrimination." *Retherford v. AT&T Commc'ns of Mountain States, Inc.*, 844 P.2d 949, 966 (Utah 1992). The statute defines "retaliate" as "the taking of adverse action by an employer . . . against one of its employees . . . because the employee . . . (i) opposes an employment practice prohibited under [the UAA]; or (ii) files charges, testifies, assists, or participates in any way in a proceeding, investigation, or hearing under [the UAA]." Utah Code § 34A-5-102(1)(y).[5] Thus, a retaliation claim focuses on the employer's response to an employee's opposition to an employer practice that is prohibited by law.

¶22    To establish retaliation, a plaintiff may submit direct evidence of retaliatory motive or adhere to the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this indirect approach, a plaintiff "must [first] make a prima facie case by showing . . . 1) [that he or] she engaged in protected opposition to discrimination or participation in a proceeding arising out of discrimination; 2) adverse action by the employer subsequent to the protected activity; and 3) a causal connection between the employee's activity and the adverse

---

5. This court has stated that the required elements to prove retaliation under the UAA are, "in effect, . . . the same elements as are required in a federal Title VII retaliation claim." *Viktron/Lika v. Labor Comm'n*, 2001 UT App 394, ¶ 6, 38 P.3d 993. Accordingly, this court has found useful guidance in the substantial body of federal Title VII law.

action." *Viktron/Lika v. Labor Comm'n*, 2001 UT App 394, ¶ 6, 38 P.3d 993 (quotation simplified).[6] If the plaintiff satisfies this burden, it is then the defendant's responsibility to come forward with a legitimate, non-retaliatory reason for the adverse employment action. *Id*. ¶ 7. If the defendant does so, then the burden shifts back to the plaintiff to show that the defendant's proffered rationale is pretextual. *Id*.

¶23 The County asserts that the Board erred in determining that Christensen suffered an adverse employment action after she

---

6. Christensen urges us to adopt a "modified 'but for'" analysis for retaliation claims at trial, requiring that a plaintiff prove "his or her protected activity was a but-for cause of the alleged adverse action by the employer," (quoting *University of Texas Sw. Med. Center v. Nassar*, 570 U.S. 338, 362 (2013)), rather than apply the burden-shifting formula from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), adopted by this court in *Viktron/Lika*. She points out that the *McDonnell Douglas* framework has limited applicability and should not be used for making determinations outside the summary judgment context. *See Barrett v. Salt Lake County*, 754 F.3d 864, 867 (10th Cir. 2014) ("[A]s things have evolved, *McDonnell Douglas* has come to apply predominantly at summary judgment and there only to cases relying on indirect proof of discrimination."). Christensen's argument has some force. But given that the Board found retaliation even under the *McDonnell Douglas* standard and that we affirm that determination, the use of the *McDonnell Douglas* framework did not adversely affect Christensen. As we are not in the business of rendering advisory opinions, *see Salt Lake County v. State*, 2020 UT 27, ¶ 47, 466 P.3d 158, we leave the question of whether the *McDonnell Douglas* framework properly applies outside the summary judgment context for another day.

engaged in protected activity.[7] It further asserts that even if Supervisor's actions toward Christensen rose to the level of adverse employment actions, they occurred prior to Christensen engaging in protected conduct or, to the extent they did not, were merely a continuation of the same actions taken prior to Christensen's complaint of harassment and discrimination. The County therefore contends that there was no causal connection between the protected conduct and the adverse actions. Finally, the County asserts that the Board erred by finding that the County's non-retaliatory explanations for its actions were pretextual. We address each argument in turn.

A.    Adverse Action

¶24    The County first asserts that after Christensen engaged in protected activity, the County's actions identified by the Board did not rise to the level of adverse action sufficient to support a retaliation claim. The UAA does not define "adverse action," and Utah's appellate courts have not fully explored the meaning of the phrase in the retaliation context. No court has explicitly stated whether the retaliatory action taken by an employer is limited to "ultimate" employment actions, such as a specific hiring, firing, demotion, or failure to promote decision, or whether the adverse action must be only sufficiently severe to dissuade a reasonable worker from making a charge of discrimination as is required by federal law.

¶25    The United States Supreme Court has held that a materially adverse action, for the purpose of a Title VII retaliation claim, is any action that would dissuade a reasonable worker from engaging in the protected activity. *Burlington N. & Santa Fe Ry. v.*

---

7. The County does not dispute that Christensen engaged in protected activity when her union representative brought her complaints to Boss on November 1, when she filed her EEO complaint with the County on January 17, and when she filed a complaint with the UALD on March 21.

*White*, 548 U.S. 53, 68 (2006). The *Burlington* court was faced with two questions: (1) "whether Title VII's antiretaliation provision forbids only those employer actions and resulting harms that are related to employment or the workplace" and (2) "how harmful an act of retaliatory discrimination must be in order to fall within the provision's scope." *Id.* at 61.

¶26 With respect to the first question, *Burlington* held that the retaliatory conduct need not be related to the terms or conditions of employment to be actionable. *Id.* at 61–62. However, it did so on the basis that Title VII's retaliation provision—contrary to its discrimination provision—specifically omits such language. *See id.* Like Title VII's discrimination provision, Utah Code section 34A-5-106(1)(a)(i) specifically mentions "terms, privileges, and conditions of employment."[8] While we are not entirely convinced

---

8. In interpreting statutes, and to ascertain and effectuate the intention of the legislature, we give a statute's words and phrases their plain and ordinary meaning. To determine the plain meaning of statutory language, we may refer to canons of interpretation, such as common usage, dictionary definitions, and grammatical rules. Here, because there is no comma following the word "discriminate" in the statute, we are inclined to read the phrase "in matters of compensation or in terms, privileges, and conditions of employment against a person otherwise qualified" as a restrictive clause that modifies only "discriminate" and not "retaliate against" or "harass." We also note that the "last antecedent" and the "nearest-reasonable-referent" rules suggest a similar reading. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 144–46, 152–53 (2012).

However, it is clear from the Board's findings that it was acting under the assumption that retaliation must be related either to compensation or to the "terms, privileges, and conditions of employment," and neither party has suggested otherwise. Because we have not been presented with any argument

(continued…)

that the UAA requires that discriminatory action for purposes of retaliation needs to be related to employment, *see supra* note 8, this question is ultimately not before us because the parties do not dispute that the adverse actions alleged by Christensen related to her employment. Thus, *Burlington*'s holding on this question does not affect our analysis.

¶27    The *Burlington* Court's answer to the second question, however, is illuminating with respect to the issue the County raises on appeal: whether the Board erred in determining that the County's allegedly retaliatory actions were sufficiently harmful to fall within the meaning of "adverse action" as that term is used in the UAA. The question of what constitutes an adverse action turns on the question of how harmful an action must be. *See Yanowitz v. L'Oreal USA, Inc.*, 116 P.3d 1123, 1135 (Cal. 2005) (explaining that "adverse employment action" has become "a familiar shorthand expression referring to the kind, nature, or degree of adverse action against an employee that will support a cause of action under a relevant provision of an employment discrimination statute").

¶28    Context is relevant to the court's inquiry. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Burlington*, 548 U.S. at 69 (quotation simplified). As the Supreme Court has also observed, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* at 68. Rather, the purpose of antiretaliation statutes is "to prevent employer interference with unfettered

---

regarding the applicability of the "terms, privileges, and conditions" phrase in the retaliation context, our analysis assumes, without deciding, that retaliation under the UAA must fall into one of the specified categories.

access to . . . remedial mechanisms . . . by prohibiting employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." *Id.* (quotation simplified). Thus, while the term "adverse action" may encompass a multitude of potential undesirable actions, to be actionable, it must be one "that a reasonable employee would have found" to be "materially adverse," such that it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[9] *Id.* (quotation simplified).

---

9. The County would have us go one step further and require that the adverse actions be "so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment." *See Darvish v. Labor Comm'n Appeals Board*, 2012 UT App 68, ¶ 36, 273 P.3d 953 (quotation simplified). It asserts that mere changes to the conditions of the employee's employment are not enough and that only severe adverse actions that create an abusive working environment are actionable. However, the "severe or pervasive" standard is specifically used to assess whether harassing or discriminatory behavior toward an employee creates an abusive or hostile work environment. *See id.* ¶¶ 33, 36. This standard recognizes the fact that antidiscrimination law "is not limited to 'economic' or 'tangible' discrimination" yet "takes a middle path" by requiring actionable conduct to be more than "merely offensive." *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quotation simplified). We are not aware of any authority using this standard to assess the required severity of retaliatory actions not rooted in a hostile work environment claim. Instead, whether an adverse action is sufficiently severe in the retaliation context turns on whether the action materially affected the terms, privileges, and conditions of employment and would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (quotation simplified).

¶29 The Board identified a number of post-complaint adverse actions taken by the County in its findings. It found that Supervisor's persistent monitoring of Christensen, including "following her, checking her swipe-card data, frequent checking on her in her office, and outlining errors in her work to auditors and other employees" "was excessive such that it altered the terms, privileges, and conditions of her employment." It also found that Boss's "instruction that [she] stop discussing the subject of her complaint with coworkers had an adverse chilling and marginalizing effect on her at work" and that his failure to forward her complaint to the human resources department for investigation was an adverse action. Further, it pointed out that the written warning Christensen received about altering her work schedule primarily identified alterations that occurred months earlier.

¶30 We cannot find fault with the Board's determination that these actions could be considered "adverse actions" that materially affected the "terms, privileges, and conditions" of Christensen's employment because they altered the conditions of her employment in a way that had the potential to "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Id.* (quotation simplified); *see also Tapia v. City of Albuquerque*, 170 F. App'x 529, 533 (10th Cir. 2006) ("[S]ufficiently severe harassing, following, and monitoring of an employee could create an adverse employment action."). Had one of Christensen's coworkers, for example, observed the difficulties she went through after raising concerns about Supervisor—such as continuing to be closely monitored by Supervisor, having her errors called out publicly before her coworkers, and receiving reprimands for events that occurred months earlier—we expect that coworker would think twice before making their own report about discrimination, harassment, or any other matter they would legally be entitled to report. This is precisely the type of circumstance the UAA is designed to prevent. *See Darvish v. Labor Comm'n Appeals Board*, 2012 UT App 68, ¶ 35, 273 P.3d 953 ("The

[UAA], like Title VII, depends for its enforcement upon the cooperation of employees who are willing to file complaints and act as witnesses. Plainly, effective enforcement could thus only be expected if employees felt free to approach officials with their grievances." (quotation simplified)). Thus, the Board did not err by identifying these actions as "adverse actions" under the UAA.

B.      Timing/Causal Connection/Continuing Conduct

¶31     The County next points out that "much of the behavior [the Board] deemed 'adverse' was the continuation of conduct that . . . was occurring" prior to the time Christensen's union representative brought her complaints to Boss's attention on November 1, 2016. It asserts that the Board could not find adverse actions that were the same as or similar to any pre-complaint actions to be retaliatory. While we accept that adverse actions occurring prior to Christensen sharing her complaints with the County on November 1, 2016, could not support a retaliation claim,[10] the same is not necessarily true of actions occurring after November 1, even if those actions were similar to or the same as the earlier adverse actions.

---

10. Christensen urges us to consider all Supervisor's actions occurring after August 26, 2016, in our analysis of adverse employment actions, suggesting that having her union representative in meetings with Supervisor put the County on notice that she was complaining about Supervisor. But Christensen's union representative did not raise her concerns with Boss until November 1, 2016. Moreover, the Board identified November 1 as the first date on which Christensen engaged in protected conduct, requiring her "to show that she was subject to adverse employment action following her complaint on November 1, 2016." On appeal, Christensen does not expressly challenge the Board's use of that date, so we accept, for purposes of our discussion, that the protected conduct at issue did not occur until November 1, 2016.

¶32   The County complains that the Board "failed to adequately acknowledge that much of the behavior it deemed 'adverse' was the continuation of conduct that had occurred—or was occurring—before Ms. Christensen engaged in any protected conduct." To the contrary, the Board explicitly recognized that "there is evidence [Supervisor] closely monitored Ms. Christensen some time before November 1, 2016," but explained that its determination was based on its analysis of the adverse actions that occurred after November 1. Thus, the County's complaint is misguided.

¶33   The County also asserts that the Board could not consider the post-complaint adverse actions to be retaliatory because they were the continuation of the previous conduct. But even if the adverse monitoring actions were merely a continuation of behavior occurring before the complaint, we are not convinced that such actions could not possibly be construed as retaliatory, as the County suggests. To make out a prima facie case, the plaintiff must show that "adverse action by the employer" occurred "subsequent to the protected activity" and that there is "a causal connection between the employee's activity and the adverse action." *Viktron/Lika v. Labor Comm'n*, 2001 UT App 394, ¶ 6, 38 P.3d 993 (quotation simplified). Nothing in this rule requires that the adverse action be new or different from prior adverse actions. The fact that Supervisor had established a "pre-complaint status quo" consisting of adverse employment actions does not grant employer immunity from legitimate complaints that the continuing adverse actions may have had a retaliatory motive.

¶34   The County asserts that allowing an employee to make a retaliation claim based on the continuation of pre-complaint behavior leaves the employer with no choice but to "acquiesce to the employee's inadequacies and shortcomings after the protected activity." But this is simply not true. The fact that continued adverse actions *may* be considered retaliatory does not mean that they *will* be considered retaliatory. The employee still must establish "a causal connection between the employee's activity

and the adverse action." *Id.* (quotation simplified). In fact, in many cases, we suspect that demonstrating causation will be a high bar when the adverse action at issue began to occur prior to the protected activity, as this fact could provide strong support for the employer's argument that its asserted legitimate reasons for the action were not pretextual.

¶35 But the fact that adverse actions taken after an employee engages in protected conduct are the same as or similar to adverse actions taken before the protected conduct does not necessarily mean that "the 'effect' . . . predates the 'cause'" of the adverse action, as the County asserts. For example, imagine a scenario where an employee receives a poor performance evaluation from their supervisor as a result of legitimately poor performance. A few months later, the employee files a sexual harassment complaint against the supervisor, alleging that the supervisor made inappropriate comments about the employee's appearance. Subsequent to the complaint, the supervisor gives the employee another poor performance evaluation. The fact that the employee had previously received a poor evaluation from the same supervisor does not necessarily mean that a later poor evaluation was merited. If the employee's performance had improved, yet their bad score remained the same, the employee may be able to show that the second poor evaluation was retaliatory.

¶36 In other words, in determining whether an adverse action occurring after protected conduct is retaliatory, the question to be resolved is whether there is a causal connection between the adverse action and the protected conduct. The fact that a similar adverse action also occurred prior to the protected conduct may bear on the question of causation, but it does not automatically preclude the adverse action from being deemed retaliatory. Thus, the Board did not err by not automatically discounting adverse actions occurring after November 1 on the ground that they were a "continuation" of prior conduct.

¶37 Here, the Board found "that [Supervisor's] scrutinizing of Ms. Christensen and calling attention to mistakes in her work appeared to intensify after the complaint and in spite of steps to separate her workspace from [Supervisor]." In other words, the adverse actions got worse after Christensen complained about Supervisor. This finding is supported by evidence that after Christensen's union representative complained to Boss, Supervisor not only continued to closely monitor Christensen but shared Christensen's errors with her coworkers at a staff meeting, went through her past purchasing receipts to look for errors, and issued her a warning concerning time reporting that had primarily occurred months earlier. Moreover, Boss largely ignored Christensen's complaint, neglecting to forward it to human resources and taking minimal steps to address Christensen's concerns while allowing Supervisor to closely monitor her more intensely than other employees. This is a close question, but given the deference this court owes in this situation, there is substantial evidence to support the Board's determination that there was a causal connection between Christensen's protected behavior and the intense scrutiny she endured following the complaint, even though she experienced some level of scrutiny prior to her complaint. *See Hexcel Corp. v. Labor Comm'n*, 2022 UT App 52, ¶¶ 22, 33, 510 P.3d 310 (stating that "the substantial evidence test is met when a reasonable mind might accept as adequate the evidence supporting the decision" and explaining that "the relevant question is not whether we would have made the same decision had we been the factfinders in the first instance" but "whether substantial evidence supports the [Board's] . . . determination" (quotation simplified)).

C.    Pretext

¶38 Once Christensen made out a prima facie case of retaliation, the burden shifted to the County to show "a legitimate, non-discriminatory reason" for the adverse action. *Viktron/Lika v. Labor Comm'n*, 2001 UT App 394, ¶ 7, 38 P.3d 993. Here, the County asserted that the adverse actions Christensen

suffered were attributable to issues with her performance. It then became Christensen's burden to show that the claimed reason was pretextual. *See id.*

¶39 Having reviewed the evidence, the Board found that the County's explanation was pretextual. It explained,

> While there is some evidence that Ms. Christensen struggled with certain aspects of her job, [the] County did not view those struggles as warranting the poor evaluation score given by [Supervisor] in late 2016. [The] County's position must therefore be that Ms. Christensen's non-compliance with its policies did not warrant a low evaluation score but did warrant [Supervisor's] constant monitoring of her workplace behavior to the point where it altered the terms, privileges and conditions of her employment.

The Board pointed out that the "County's reasoning appears inconsistent because [Supervisor] cited Ms. Christensen's behavior as the basis for the low evaluation score," and the Board found it "implausible" that the County would have directed Supervisor to raise Christensen's performance evaluation score if it truly believed her performance warranted the burdensome scrutiny Supervisor had her under.[11]

---

11. The Board also found it disingenuous for the County to give Christensen a written warning "immediately after she filed her EEO complaint" where the warning related to behavior that occurred months earlier. We acknowledge, as noted, *supra* note 2, that the written warning was actually given to Christensen the same day she filed her EEO complaint, and the record is unclear which event occurred first or whether the County was aware of the EEO complaint before issuing the warning. Nevertheless, it is

(continued…)

¶40 Again, whether this court would have made the same decision had we been the factfinders in the first instance is not the question before us. Based upon the evidence in the record, substantial evidence supports the Board's finding that the County's decision to alter Christensen's performance evaluation score was inconsistent with a belief that Christensen's shortcomings were egregious enough to justify the adverse actions she suffered. Moreover, the County has not shown that the Board erred in finding that other actions taken by the County—sharing Christensen's errors with her coworkers and directing her not to talk about her allegations with coworkers—were unrelated to alleged poor work performance. The Board's pretext determination—while not the only permissible one under the circumstances—is not clearly erroneous.

## II. Remedies

¶41 On appeal, both parties raise challenges to the Board's decision with respect to appropriate remedies. Christensen challenges the Board's refusal to award her noneconomic damages in connection with her claim, its denial of her claim for back pay, and its denial of her claim for attorney fees. For its part, the County challenges the Board's decision upholding Judge Newman's order that it reinstate Christensen and reimburse her for vacation pay, sick leave pay, and the retirement funds that she withdrew early.

---

still relevant that the warning was issued after Christensen complained of discrimination on November 1, despite the fact that most of the incidents addressed in the warning preceded that complaint by several months.

A.     Christensen's Challenges

1.     Noneconomic Damages

¶42     The UAA outlines the damages available to a party who successfully proves their claim.

> If, upon reviewing all the evidence at the hearing, the presiding officer finds that a respondent has engaged in a discriminatory or prohibited employment practice, the presiding officer shall issue an order requiring the respondent to:
>
> (a) cease any discriminatory or prohibited employment practice;
>
> (b) provide relief to the complaining party, including:
>
>> (i) reinstatement;
>>
>> (ii) back pay and benefits;
>>
>> (iii) attorney fees; and
>>
>> (iv) costs.

Utah Code § 34A-5-107(8).

¶43     Christensen asserts that despite it not being explicitly included in the list of available damages identified in the UAA, noneconomic or other compensatory damages should be awardable in the course of "provid[ing] relief to the complaining party." *See id.* She argues that the word "including," which precedes the explicit list, indicates that the listed damages are "meant to be illustrative not exhaustive." *See Graves v. North E. Services, Inc.*, 2015 UT 28, ¶ 53, 345 P.3d 619 ("[*I*]*ncluding* is an established term of art with an established meaning. In statutory

cases far and wide, this term is routinely construed as introducing a non-exclusive, exemplary list." (citation omitted)). *See generally Including*, Black's Law Dictionary (11th ed. 2019) ("[*I*]*ncluding* typically indicates a partial list.").

¶44 While we agree that the list provided in the statute is not exhaustive, we are not convinced that the UAA provides for recovery of noneconomic damages. The principle of ejusdem generis tells us "that general catchall terms appearing at the beginning or end of an exemplary statutory list are understood to be informed by the content of the terms of the list." *Rutherford v. Talisker Canyons Fin., Co., LLC*, 2019 UT 27, ¶ 38, 445 P.3d 474 (quotation simplified). "Ejusdem generis presumes that in order to give meaning to a general term, the general term is understood as restricted to include things of the same kind, class, character, or nature as those specifically enumerated." *Id.* (quotation simplified). All the examples of "relief" listed in the statute are either equitable remedies or economic damages. The remedy of ordering the respondent to "cease any discriminatory or prohibited employment practice" is likewise equitable. *See* Utah Code § 34A-5-107(8)(a). None of the remedies in the list or any other provision in the statute addresses intangible harm. Thus, while there may be unlisted equitable remedies or economic damages that may be reasonably awarded under the statute— such as the retirement reimbursement awarded in this case— Christensen has not persuaded us that the UAA can reasonably be read to allow for noneconomic damages.[12]

---

12. Christensen points out that federal law provides for noneconomic relief in the context of discrimination claims. However, the section of the UAA addressing remedies provides, "The procedures contained in this section are the exclusive remedy under state law for employment discrimination based upon . . . retaliation . . . ." Utah Code § 34A-5-107(15). While federal law can provide a useful guide in some circumstances, it

(continued…)

¶45    Christensen also asserts that noneconomic damages should be allowed as a matter of policy because there are many cases where noneconomic damages are the only measurable damages suffered by a victim. In such cases, Christensen reasons, "the employee has no incentive to bring the action to the Labor Commission because the Labor Commission cannot provide any relief to the employee because there was no economic action against the employee." But this is not accurate. In fact, the statute does provide a remedy for employees who have suffered discrimination or retaliation but have not incurred economic damages: the ALJ must "issue an order requiring the respondent to . . . cease any discriminatory or prohibited employment practice." *Id.* Such employees can also recoup their attorney fees incurred in enforcing the UAA. *See id.*; *see also infra* ¶¶ 50–55. Presumably, this remedy will provide victims of discriminatory or prohibited employment practices some relief from their employer's illegal actions. While it may not provide quite the same deterrent as an award of monetary damages, that is a policy choice for our legislature to make.

2.    Back Pay

¶46    Christensen next asserts that the Board erred in setting aside Judge Newman's award of back pay for the time between her retirement and her reinstatement. The County argued to the Board that an award of back pay was not available in light of the Board's finding that Christensen was not constructively discharged. The Board did not discuss the County's argument in detail but set aside Judge Newman's award of back pay on the basis that back pay "is not justified by the facts of this case." Christensen challenges this determination, asserting that the

---

ultimately cannot trump the explicit provisions of our statute. As the UAA provides the exclusive remedies available under state law, we have no basis for expanding those remedies to include noneconomic damages.

award of back pay was not contingent on a finding of constructive discharge.[13]

---

13. Christensen also asserts that an award of back pay was mandatory under the remedy provision of the UAA. Once again, that provision states,

> If, upon reviewing all the evidence at the hearing, the presiding officer finds that a respondent has engaged in a discriminatory or prohibited employment practice, the presiding officer shall issue an order requiring the respondent to:
> (a) cease any discriminatory or prohibited employment practice;
> (b) provide relief to the complaining party, including:
>> (i) reinstatement;
>> (ii) back pay and benefits;
>> (iii) attorney fees; and
>> (iv) costs.

Utah Code § 34A-5-107(8).

Christensen points to the UAA's use of the word "shall" in asserting the presiding officer's obligation to issue an order and interprets that phrase as requiring the ALJ to issue an order that includes each item of relief listed in the statute. We agree with the County that the "shall" language requires the ALJ to issue an order providing relief to the complaining party, but the precise contours of the relief ordered will depend on the damages actually suffered by the complaining party. Those damages may include the type of damages that follows the word "including," but the ALJ is not required to include each element of relief. If we were to conclude otherwise, ALJs would be required to order relief even where certain harms were not incurred. An employee who continues to work for the employer, for example, could neither be reinstated nor deserve back pay. Yet Christensen's

(continued…)

¶47　We disagree with Christensen. Constructive discharge "is equivalent to a termination" and occurs when an employee resigns "under working conditions that a reasonable employee would consider intolerable." *See Touchard v. La-Z-Boy Inc.*, 2006 UT 71, ¶ 27, 148 P.3d 945. In other words, in the case of constructive discharge, the employee's job and wage loss are caused by the employer's intolerable actions. The purpose of providing relief to an employee who suffered discrimination or retaliation is to put the plaintiff in the same position they would have been in if it were not for the defendant's wrongful actions. *Cf. Gregory & Swapp, PLLC v. Kranendonk*, 2018 UT 36, ¶ 28, 424 P.3d 897 (discussing the remedial purpose of damages in contract cases); *Mahana v. Onyx Acceptance Corp.*, 2004 UT 59, ¶ 26, 96 P.3d 893 (discussing the remedial purpose of damages in tort cases). Thus, if there is no causal connection between the employee's job and wage loss and the employer's actions, the employee cannot recover compensation for that loss.

¶48　A claim for back pay associated with a claim that an employer engaged in a discriminatory or prohibited employment practice must be supported by evidence that the employee lost pay as a result of the employer's actions. In a circumstance where an employee quits, the employee cannot show that the lost pay from leaving the job was the result of the employer's wrongful action unless the employee can establish constructive discharge. If the employee leaves a job voluntarily, under circumstances that would not have prompted a similarly situated employee to quit, then neither the decision to quit nor the ensuing loss of wages can be properly attributed to the employer. *See Derr v. Gulf Oil Corp.*, 796 F.2d 340, 342 (10th Cir. 1986) (collecting cases concluding that "the remedies of back pay and reinstatement are not available . . . unless [the employee] was constructively discharged"); *accord*

reading would require the ALJ to award such damages anyway. It would be illogical to read the statute in such a way.

*Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, 1237 (10th Cir. 2000).

¶49 Here, the Board found that although the County retaliated against Christensen by subjecting her to adverse employment actions, her working conditions were not so intolerable as to compel "a reasonable person in [her] position to resign." In other words, Christensen did not lose her employment or suffer any direct wage loss because of the County's actions. And Christensen has not challenged the Board's finding that she was not constructively discharged. Because Christensen did not show any job or direct wage loss, the Board did not err in setting aside Judge Newman's award of back pay to Christensen.

3.      Attorney Fees

¶50 Christensen challenges the Board's refusal to award her attorney fees.[14] Judge Newman noted the UAA authorizes an award of attorney fees to a complaining party after a determination that the employer engaged in a discriminatory or prohibited employment practice, *see* Utah Code § 34A-5-107(8), but opined that our supreme court's holding in *Injured Workers Ass'n of Utah v. State*, 2016 UT 21, 374 P.3d 14, stands for the proposition that such a grant of authority is unconstitutional. Based on his interpretation of that precedent, Judge Newman declined to award attorney fees to Christensen. The Board agreed with the ALJ's analysis and also denied Christensen's request for fees on the same basis. We conclude that Judge Newman's and the Board's denials were based on an erroneous interpretation of *Injured Workers*.

---

14. Apart from asserting that no remedies are warranted because the Board erred in finding that the County had engaged in retaliation, the County makes no argument in support of the Board's attorney fee decision.

¶51    *Injured Workers* addressed another provision of the Utah Code, which granted the Labor Commission "full power to regulate and fix the fee charge of attorneys involved in workers' compensation cases." *Id.* ¶ 5 (quotation simplified). The supreme court struck down that statute, and the sliding-scale attorney fee schedule and cap adopted by the Labor Commission pursuant to that statutory authorization, concluding that "the regulation of attorney fees falls squarely within the practice of law," which the Utah Supreme Court has "plenary authority" to govern. *Id.* ¶¶ 14–15. Because "[r]egulating attorney fees goes to the very heart of the practice of law" and "the supreme court is in a better position than an administrative agency to determine the reasonableness of attorney fees," the court concluded that it could not "delegate the authority to regulate attorney fees in workers' compensation cases to the legislature" and that, in turn, the legislature could not delegate that authority to the Labor Commission. *Id.* ¶¶ 15, 33.

¶52    The supreme court also declined to adopt its own fee schedule for regulating the fees of injured workers' attorneys because "attorneys remain bound by rule 1.5 and the other Utah Rules of Professional Conduct—just as in any other case—and therefore may charge only reasonable fees." *Id.* ¶ 35. The supreme court reasoned that "the absence of a fee schedule will allow injured workers the flexibility to negotiate appropriate fees with their attorneys." *Id.* ¶ 39. "[R]ule 1.5 of the Rules of Professional Conduct requires attorneys to charge a reasonable attorney fee in all cases. Attorneys that violate this rule may be subject to sanctions." *Id.* ¶ 40. Thus, any attorney violating these rules may have their fee agreement invalidated and be referred to the Office of Professional Conduct of the Utah State Bar for discipline. *See id.* Concluding "that injured workers are adequately safeguarded by current rules against attorneys . . . charging unreasonable fees," the supreme court "decline[d] to enact a fee schedule at this time." *Id.* ¶ 42.

¶53    In the wake of *Injured Workers*, the Labor Commission has declined to award fees in workers' compensation cases, including

discrimination cases, based upon its conclusion that any such award would necessarily require the prohibited involvement of the legislative and executive branches in the regulation of the practice of law. But in our view, this position is not compelled by *Injured Workers* and has resulted in the denial of attorney fee awards in all cases, even those cases where the applicable statutes authorize such an award. As mentioned above, *Injured Workers* addressed the constitutionality of a statute that gave the Labor Commission full authority to regulate and fix attorney fees and to set limits on the fees attorneys could charge for their services. *Id*. ¶ 33 ("Regulating attorney fees goes to the very heart of the practice of law, inasmuch as it involves assessment of the quality, amount, and value of legal services related to a legal problem."). Here, the allegations of discrimination and retaliation were brought pursuant to section 34A-5-107(8) of the Utah Code, which does not give the Labor Commission the "full power to regulate and fix fees" but rather allows the ALJ to provide relief to someone who has been subjected to discrimination. Indeed, as our supreme court noted, "We stress that this opinion is limited to legislative attempts to regulate the attorney-client relationship. We are not foreclosing the legislature's ability to designate statutory attorney fee awards." *Id*. ¶ 34 n.7.

¶54   *Injured Workers* appears to contemplate that attorneys and injured workers will negotiate a reasonable fee subject to rule 1.5 and other rules of professional conduct. That is, attorneys who represent injured workers before the Labor Commission remain subject to the requirements of the professional rules to negotiate and charge a reasonable fee "just as in any other case." *Id.* ¶ 35. The determination of what constitutes a reasonable fee is, in turn, guided by rule 1.5 of the Rules of Professional Conduct, which the supreme court noted "lay[s] out several factors that should be taken into consideration when calculating a 'reasonable' attorney fee: the time and labor required, the amount involved in the controversy, the contingency or certainty of the compensation, etc." *Id.* ¶ 32. Noting that "in rule 1.5, we mandate that a lawyer

shall not make an agreement for, charge or collect an unreasonable fee," the supreme court stated that the rule has served "as a guideline in determining the reasonableness of attorney fees." *Id.* ¶ 33 (quotation simplified). If an attorney charges an excessive fee, they face the possibility that the contract will be set aside and they will be subject to sanctions. *See id.* ¶ 41 (citing *Dahl v. Dahl*, 2015 UT 79, 459 P.3d 276, in which the supreme court invalidated an attorney's fee agreement and referred the attorney to the Office of Professional Conduct for disciplinary proceedings).

¶55 Here, the ALJ was not asked to assess "the quality, amount, and value of legal services" provided by Christensen's attorney. *See id.* ¶ 33. Rather, Judge Newman was asked to enter an award of fees related to Christensen's successful showing of retaliation. This required Judge Newman only to determine whether Christensen incurred attorney fees in bringing her retaliation claim and to order relief to Christensen as allowed under the statute. Entering an award of fees, without passing judgment on the reasonableness underlying those fees, does not infringe on the supreme court's authority to regulate the practice of law, and the legislature therefore did not exceed its authority in delegating the authority to award attorney fees in antidiscrimination cases to the Labor Commission.[15] Accordingly, the ALJ and the Board erred

---

15. To be clear, when we refer to "reasonableness" here, we are talking about the amount an attorney charges for a particular service, not other potential concerns such as the relatedness of the charges. An agency could, for example, conclude that fees charged were inappropriate because they pertained to work not actually done by the attorney or work relating to other matters for which attorney fees were not awarded. But it could not deny an award of fees on the ground, for example, that the attorney's hourly rate was not consistent with rates charged by similarly situated lawyers.

in declining to award Christensen her attorney fees based on a perceived lack of authority. We therefore remand for the Board to enter a judgment for the amount of the fees.

**B.      The County's Challenges**

**1.      Reinstatement**

¶56      The County challenges the Board's order that it reinstate Christensen's employment on the ground that she was not constructively discharged.[16] For the same reasons an award of back pay is not appropriate where an employee is not constructively discharged and suffers no direct wage loss, *see supra* ¶ 48, reinstatement is also not an appropriate remedy when there has been no job loss. Because Christensen voluntarily left her employment with the County when she retired early, we agree that the Board erred in ordering the County to reinstate Christensen's employment.

**2.      Vacation and Sick Leave**

¶57      The County next asserts that the Board should have set aside Judge Newman's award of the value of vacation and sick leave Christensen used while still employed with the County. The County asserts that this resulted in a "double recovery" because Christensen received the value of her sick leave when she took FMLA leave.

---

16. The County also asserts that the Board should not have ordered reinstatement because it was not a remedy Christensen requested. Because we agree with the County that reinstatement was not an available remedy where there was no determination of constructive discharge, we do not address the question of whether an ALJ or the Board may award remedies not requested by the plaintiff.

¶58 However, the County's argument assumes that the vacation pay and sick leave had no value beyond their use during Christensen's employment. That does not appear to be the case: Christensen maintains that "she would have been able to cash out that sick and leave pay" when she retired. Though there was no constructive discharge and Christensen did not resign, she did take other steps to alleviate the retaliatory adverse actions she was facing, which did cause her to suffer some benefit loss. That is, while using her accrued leave and retiring early allowed Christensen to maintain a steady income throughout her leave and into retirement such that she did not suffer the direct loss of wages that would entitle her to back pay, Christensen still incurred losses, albeit less than she would have suffered by quitting her job outright. A reasonable person who might not find working conditions so intolerable as to quit their job and find themselves without income might, nevertheless, do as Christensen did and use up all vacation and sick leave to remove themselves from the retaliation. In other words, had the County's retaliation not caused Christensen to take FMLA leave in response to its conduct, she could have continued working and earning her regular salary for that time period and either used her vacation and sick leave to take time off at a later date or, consistent with the County's rules, cashed out those benefits at the time she left her job. Thus, we agree with the Board that an award of these benefits was appropriate under the statute.

3.     Retirement

¶59 As discussed above, the UAA directs an order of relief to the plaintiff upon a determination that an employer has engaged in a prohibited employment practice. *See* Utah Code § 34A-5-107(8). And the statutory list of available relief is not exhaustive. Thus, the available relief was broad enough to encompass the

economic loss Christensen suffered when she retired early in response to the adverse actions she endured.[17]

¶60 In this case, the Board ordered the County to reimburse Christensen for the amount she withdrew from her retirement account to allow her to retire early. The Board found that

---

17. The County once again reminds us that Christensen was not constructively discharged. However, there is a subtle difference between the question of whether the County's adverse actions prompted Christensen to leave her employment and whether those actions prompted her to take early retirement when it became available.

A finding of constructive discharge requires an employee to show that they resigned "under working conditions that a reasonable person would view as intolerable." *Touchard v. La-Z-Boy Inc.*, 2006 UT 71, ¶ 26, 148 P.3d 945 (quotation simplified). But here, because the Board determined that the County's adverse employment actions would not have compelled a reasonable person in the circumstances in which Christensen found herself to resign, Christensen was not discharged and is not entitled to reinstatement or back pay. But although Christensen did not resign, she took other steps, as she did with her vacation pay and sick leave, to alleviate the retaliatory adverse actions she was facing and suffered certain economic loss as a result. A reasonable person who might not find working conditions so intolerable as to quit their job and find themselves without wages might, nevertheless, finding themselves within arms-length of retirement, take the steps Christensen took to achieve an early retirement to remove themselves from the adverse employment situation. Thus, we do not agree with the County that the fact that Christensen was not constructively discharged prevents her from recovering the economic loss she incurred to allow her to retire early. Despite not finding constructive discharge, the Board did find that the adverse actions directed at Christensen prompted her to retire earlier than she otherwise would have.

retaliatory changes in "Ms. Christensen's employment prompted the withdrawal from her retirement account . . . to secure early retirement and extricate herself from the retaliatory change[s]."

¶61   The County asserts that Christensen did not suffer an injury when she withdrew this money because she "merely transferr[ed] funds from her retirement account in order to receive an enhanced benefit in her pension account." However, the record evidence showed that Christensen did not intend to retire until she turned sixty-five and that the retaliatory actions she suffered prompted her decision to retire early. Had she retired when she originally intended to, the value of her pension would have been greater and there would have been no need for her to withdraw retirement funds to obtain an "enhanced benefit." Thus, it was reasonable for the Board to find that her withdrawal of the retirement funds was a compensable loss under the UAA.

### III. Attorney Fees on Review in This Court

¶62   Finally, Christensen requests an award of fees on judicial review. Christensen has not cited any authority justifying an award of fees in this circumstance. Thus, we deny her request for an award of fees and costs incurred in bringing her petition and defending against the County's petition.

### CONCLUSION

¶63   We decline to set aside the Board's determination that Christensen suffered retaliation under the UAA. We set aside the Board's order that the County reinstate Christensen's employment but uphold its award of additional remedies. Finally, we remand this matter to the Board to calculate the fees Christensen incurred in bringing her UAA claim before the agency.

———————

POHLMAN, Justice (concurring in part and dissenting in part):

¶64    I respectfully concur in part and dissent in part.

¶65    I agree with the majority's analysis in Part I regarding the appropriate legal standard to apply, but I agree with the County that the Board did not apply that legal standard in this case. Thus, rather than approve the Board's decision, I would set the Board's entire decision aside and instruct it to apply the correct standard in the first instance.

¶66    Because I would set aside the Board's decision and instruct the Board to revisit its retaliation determination, I would not reach the parties' challenges to the Commission's decision as to whether certain remedies are available to Christensen. But I write briefly on the issue of attorney fees only to urge our supreme court, if given the opportunity, to address the application of *Injured Workers Ass'n of Utah v. State*, 2016 UT 21, 374 P.3d 14, to section 34A-5-107(8)(b)(iii) of the Utah Antidiscrimination Act (the UAA).

## I. Retaliation

¶67    In challenging the Board's determination that the County unlawfully retaliated against Christensen for complaining of discrimination, the County argues that the Board "applied an incorrect legal standard." The County recognizes, as does the majority, that an action is sufficiently adverse to be considered retaliatory if it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotation simplified); *see also supra* ¶ 28. But the County contends that the Board did not apply this standard. It argues that, instead, the Board assessed only whether the County adversely changed or altered the terms, privileges, and conditions of Christensen's employment. And the County argues that by failing to apply the correct legal standard, the Board failed to adequately assess the

severity of the adverse actions and thus erred in concluding that the County's conduct was actionable.

¶68    I agree with the County. Although the Board occasionally stated that the County's actions were "material," the Board did not articulate how it assessed materiality, and it does not appear that the Board considered whether the actions were such that they "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *See Burlington*, 548 U.S. at 68 (quotation simplified). Indeed, there is no application of this objective standard in its decision; rather, the Board's assessment depends only on its view that the terms, privileges, and conditions of Christensen's employment were altered or changed.

¶69    The majority concludes that the Board's decision is sustainable based on the majority's view that the County's actions "had the potential to 'dissuade[] a reasonable worker from . . . supporting a charge of discrimination.'" *See supra* ¶ 30 (quoting *Burlington*, 548 U.S. at 68). But given the fact-intensive nature of this assessment and the limited extent of the Board's findings, I am not comfortable taking the Board's decision and grafting it into the correct legal framework. *Cf. Burlington*, 548 U.S. at 69 (explaining that "the significance of any given act of retaliation will often depend upon the particular circumstances").

¶70    For example, it is difficult to know how to assess the Board's statement that Supervisor followed Christensen and "closely monitored" her, *see supra* ¶¶ 29, 32, because there are no findings in either the ALJ's or the Board's decisions about her being followed or describing how and when she was "closely monitored."[18] Similarly, without additional context, it is not

18. As acknowledged in Part I.B of the majority's opinion, some of the conduct Christensen identified as retaliatory was the same type of conduct that occurred before she complained of discrimination to her union representative. The Board's decision

(continued…)

apparent to me why the sharing of two documents containing Christensen's mistakes, reviewing her purchasing activity from the prior year, and her observation that errors were marked in her files necessarily would have dissuaded a reasonable worker from making or supporting a charge of discrimination.[19] *See, e.g., Sotunde v. Safeway, Inc.*, 716 F. App'x 758, 767–68 (10th Cir. 2017) (concluding that criticisms of work and low performance evaluations were insufficient to support a retaliation claim under the "might have dissuaded" standard); *Keller v. Crown Cork & Seal USA, Inc.*, 491 F. App'x 908, 914 (10th Cir. 2012) (rejecting, as a matter of law, a claim of retaliation based on complaints about "strict application of policies, increased supervision, write-ups, means and methods of communication with . . . supervisors, and restrictions on . . . employment relationships").

¶71 Thus, while I remain open to the determination that the County's actions were sufficiently timely and targeted so as to meet that standard, without further explanation from the Board, I cannot reach that conclusion on my own. Accordingly, I would not allow the Board's retaliation determination to stand. Instead, I would set its order aside with instructions to apply the "might have dissuaded" standard to the County's actions that post-date Christensen's complaint. *See Jensen Tech Services v. Labor Comm'n,*

---

does not carefully distinguish between pre- and post-reporting conduct, and thus it is difficult to assess the nature of the post-reporting conduct and whether it meets the "might have dissuaded" standard.

19. After all, these events didn't dissuade Christensen from making a charge of discrimination. She filed her UALD complaint charging harassment and discrimination after these events occurred. *See supra* ¶¶ 8–10. Although Christensen's subjective response does not preclude the objective standard from being met, it leaves me wanting further explanation from the Board before I can conclude that the standard was met.

2022 UT App 18, ¶ 9, 506 P.3d 616 ("[W]hen an agency misapplies the governing law in making a decision, we may set aside the resulting decision with instructions to reconsider the issue.").

## II. *Injured Workers* and Attorney Fees

¶72    As the majority notes, the UAA authorizes an award of attorney fees to a claimant as a form of relief after finding that a respondent has engaged in a discriminatory or prohibited employment practice. *See supra* ¶ 50. But the ALJ, and in turn the Board, declined to award attorney fees to Christensen based on their assessment that *Injured Workers Ass'n of Utah v. State*, 2016 UT 21, 374 P.3d 14, "stands for the proposition that such a grant of authority is unconstitutional." *See supra* ¶ 50. The Board reached this conclusion in this and other cases[20] based on its view that "the mechanism for awarding attorney fees through [the claimant's attorney fee] affidavit would . . . involve considering and approving such affidavit," and that that process would unconstitutionally encroach on the power of the judiciary to govern the practice of law.[21]

---

20. This does not appear to be the only case where the Board took this position. The Board noted in its decision in this case that it "has previously determined that it does not have the authority to award attorney fees in antidiscrimination cases."

21. I appreciate the Board's efforts to interpret *Injured Workers* and its application to this case. I question, however, the Board's authority to simply decline to apply section 34A-5-107(8)(b)(iii) of the UAA on the basis that the section is unconstitutional, without seeking a declaration of such from the courts. *See, e.g., Renn v. Utah State Board of Pardons*, 904 P.2d 677, 680 (Utah 1995) ("It has long been held that the judicial power includes the authority to decide whether a statute is constitutional."); *cf. Nebeker v. Utah State Tax Comm'n*, 2001 UT 74, ¶ 15, 34 P.3d 180 ("It is not for the Tax

(continued…)

¶73    The majority sets aside the Board's decision on this point, concluding that "the ALJ was not asked to assess 'the quality, amount, and value of legal services' provided by Christensen's attorney." *See supra* ¶ 55 (quoting *Injured Workers*, 2016 UT 21, ¶ 33). Thus, it concludes that because the ALJ (and ultimately the Board) are asked only to enter an award of fees "without passing judgment on the reasonableness underlying those fees," the ALJ and the Board will not regulate the practice of law and thus the legislature "did not exceed its authority in delegating the authority to award attorney fees in antidiscrimination cases to the Labor Commission." *See supra* ¶ 55.

¶74    I do not fault my colleagues for the needle they thread. On the one hand, the supreme court in *Injured Workers* declared that the regulation of attorney fees, which it describes as involving the "assessment of the quality, amount, and value of legal services related to a legal problem," is a power vested exclusively in the judiciary. *See* 2016 UT 21, ¶ 33. But on the other hand, the supreme court stressed the limitation of its opinion, stating it did not foreclose "the legislature's ability to designate statutory attorney fee awards." *Id.* ¶ 34 n.7. In trying to square those two statements, the majority concludes that statutory attorney fee awards are permitted but that the Labor Commission cannot assess the reasonableness of an attorney fee request. *See supra* ¶ 55.

¶75    While I do not question the logic of that resolution, I question how the resolution will work in practice. The Board, after all, observed in this case that to resolve Christensen's attorney fee request, the ALJ and the Board would have to judge her attorney fee affidavit. And that observation is consistent with the supreme court's admonition that "'[r]easonableness' is generally the standard" to be applied to requests for statutory attorney fee awards. *See Canyon Country Store v. Bracey*, 781 P.2d 414, 420 (Utah 1989) (referring to court-awarded attorney fees). I worry that

Commission to determine questions of . . . constitutionality of legislative enactments." (quotation simplified)).

some confusion, if not unfairness, may be introduced into the process if that reasonableness determination is not part of the equation.

¶76 Unfortunately, the parties' briefing on this question was limited. Christensen suggested that the parties "engage in discussions to prevent unnecessary litigation over fees beforehand," or that a party who disagrees with the amount of fees awarded under section 34A-5-107(8)(b)(iii) "retains the right to have the Courts review the amount for appropriateness." I'm not confident that Christensen's first proposed solution adequately addresses the problem, and Christensen cites no authority for the second. Further, on review, neither the Commission nor the County responded to Christensen's assertion or expressed any opinion on the *Injured Workers* issue. Under these circumstances, I hesitate to weigh in conclusively on the question. But because of the importance of this issue generally and its impact on attorney fee requests in matters arising under the UAA, I urge the supreme court to address the application of *Injured Workers* to section 34A-5-107(8)(b)(iii) when appropriate.

———