*This opinion is subject to revision before final publication in the Pacific Reporter*

**2025 UT 55**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

THERESA CHRISTENSEN,
*Respondent and Cross-petitioner,*

*v.*

SALT LAKE COUNTY,
*Petitioner and Cross-respondent*

*v.*

UTAH LABOR COMMISSION,
*Respondent.*

No. 20230965
Heard January 13, 2025
Filed November 13, 2025

On Certiorari to the Utah Court of Appeals

Utah Labor Commission
No. 8-07-0290

Attorneys:

Russell T. Monahan, Salt Lake City, for respondent and cross-petitioner

Sim Gill, William G. Garbina, Joshua K. Peterman, Salt Lake City, for petitioner and cross-respondent

Derek E. Brown, Att'y Gen., Scott Higley, Asst. Att'y Gen., Erin T. Middleton, Steve Geary, Asst. Solics. Gen., Salt Lake City, for respondent

JUSTICE PETERSEN authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE PEARCE, JUSTICE HAGEN, and JUDGE NIELSEN joined.

Having recused herself JUSTICE POHLMAN does not participate herein; DISTRICT COURT JUDGE JOHN J. NIELSEN sat.

JUSTICE PETERSEN, opinion of the Court:

## INTRODUCTION

¶1    Theresa Christensen sued her former employer, Salt Lake County, under the Utah Antidiscrimination Act (UAA). Among other things, she claimed that the County retaliated against her after she complained that her supervisor was sexually harassing her.

¶2    The Labor Commission Appeals Board (Board) concluded that Christensen had proven the County retaliated against her. And it awarded her compensation for certain damages she had suffered. But it denied her request for statutory attorney fees because it concluded that our opinion in *Injured Workers Ass'n of Utah v. State*, 2016 UT 21, 374 P.3d 14, foreclosed such an award.

¶3    The court of appeals upheld the Board's decision on Christensen's retaliation claim. In analyzing the claim, the court noted that the UAA defines retaliation, in relevant part, as "the taking of *adverse action*" by an employer against one of its employees because the employee opposed a prohibited employment practice, UTAH CODE §§ 34A-5-102(1)(y), -106-(1)(a)(i) (emphasis added), but that the statute does not define "adverse action." And it observed that Utah's appellate courts "have not fully explored the meaning of the phrase in the retaliation context." *Christensen v. Lab. Comm'n*, 2023 UT App 100, ¶ 24, 536 P.3d 1114.

¶4    After exploring the meaning for itself, the court of appeals adopted the U.S. Supreme Court's test from *Burlington Northern & Santa Fe Railway v. White*, 548 U.S. 53 (2006). That case holds that to constitute actionable retaliation, an employer's action must be one "that a reasonable employee would have found to be materially adverse," such that it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Christensen*, 2023 UT App 100, ¶ 28 (quoting *Burlington*, 548 U.S. at 68). The court of appeals applied this new standard to Christensen's claim and upheld the Board's decision. *Id.* ¶ 30.

¶5    But on attorney fees, the court of appeals disagreed with the Board that *Injured Workers* precluded the Labor Commission from awarding statutory attorney fees. *Id.* ¶ 50. The court concluded that the Board is free to award attorney fees, but that *Injured Workers* limits its authority to assess such an award for reasonableness. *Id.* ¶ 55.

¶6 Both parties sought certiorari review, which we granted. The County contends that the court of appeals erred in two ways. First, it argues that because the court of appeals applied a new definition of "adverse action"—one that the Board had not applied—the court should have remanded the claim instead of applying the new legal standard in the first instance. Second, the County says that if the Labor Commission awards statutory attorney fees, it must be able to assess a fee request for reasonableness consistent with applicable caselaw.

¶7 For her part, Christensen asks that we clarify what a complaining party must prove to prevail on a retaliation claim. She observes that the court of appeals and the Board applied to her claim the framework developed by the U.S. Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In *McDonnell Douglas,* the Supreme Court established a burden-shifting scheme to analyze employment claims under Title VII: first, a plaintiff must make a prima facie case of the claim at issue (here, retaliation); second, the defendant must "articulate some legitimate, nondiscriminatory [or nonretaliatory] reason" for the adverse action; and finally, the plaintiff must prove that the defendant's articulated reason is pretextual. *Id.* at 802–04. Christensen asks that if we remand her retaliation claim back to the Board as the County requests, we address her argument that the steps of the *McDonnell Douglas* test should not apply at a hearing before an administrative law judge (ALJ).

¶8 With respect to the meaning of "adverse action" under the UAA, we agree with the court of appeals' adoption of the *Burlington* standard. But we disagree with its application of that standard for the first time on appeal. A remand was necessary in this case because it is not apparent from the record that the Board's decision can be upheld under the new standard. Accordingly, we remand the case to the Board so it can apply the *Burlington* standard for itself and make additional findings and conclusions as necessary.

¶9 Because we remand, we take up Christensen's objection to the *McDonnell Douglas* framework. We explain that the *McDonnell Douglas* burden-shifting framework is a "*procedural* device, designed only to establish an order of proof and production." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993). While helpful in that capacity, *McDonnell Douglas* does not purport to set out the elements of a retaliation or discrimination claim. The ultimate question for an ALJ or the Board is whether an employee has

proven that their employer engaged in intentional retaliation or discrimination.

¶10 Finally, we clarify that *Injured Workers* does not prevent the Labor Commission from awarding statutory attorney fees or from evaluating those awards for reasonableness.

¶11 Accordingly, we affirm in part, reverse in part, and remand to the Board for further proceedings.[1]

## BACKGROUND

¶12 Theresa Christensen began working for Salt Lake County in 1988. For approximately twenty-eight years, Christensen consistently received positive employment evaluations. That changed when Brian Beck became her supervisor in the summer of 2016.

¶13 The difficulties began almost immediately. According to Christensen, her first meeting with Beck was unusual and unprofessional. From the moment she walked into his office, she said Beck looked her "up and down" and began commenting on her appearance. Christensen explained,

> I sat down at the round table with him, and you know. . . . He talked about my hair. He talked about, you know, my clothes. He talked about, you know, the blouse I was wearing, how it looked really good on me. He wanted to know where I bought my clothes, where I went shopping. You know he says, 'Oh, I notice you get your nails done too.' . . . that's all he talked about, you know, for a good half hour.

¶14 The comments did not end there. Once, Beck stopped by Christensen's office to tell her, "Oh, you're wearing that blouse I really like." And when Christensen would walk by Beck's office, Beck would yell out to her, saying, "Oh, Theresa, you're wearing

---

[1] Christensen also objects to the fact that after her hearing, the original ALJ who presided over the hearing was replaced by another ALJ and Christensen was not given a reason for the replacement. We address this argument, but find it unavailing.

Additionally, both parties have raised issues regarding Christensen's damages award. However, because we remand Christensen's retaliation claim to the Board for a new analysis under the correct legal standards, we do not reach these issues.

my favorite blouse today"; or, "You got your hair done. It looks really nice." Christensen was "not used to" that sort of behavior in the workplace.

¶15 Beck also began monitoring her closely—too closely for Christensen's comfort. This attention did not go unnoticed by coworkers. Svetlana Bryner, a construction project manager, observed that Beck would walk by Christensen's office "a lot" and could be seen "peeking in," often interrupting her work. Irene Ann Cordova, a county purchasing coordinator, would occasionally visit Christensen's office during work. When Cordova would visit Christensen with a work question, she noticed that Beck would hover at the door outside Christensen's office. She observed that "it was like he was watching her all the time."

¶16 By September 2016, Christensen no longer "fe[lt] comfortable being alone with [Beck]" and decided to contact her union representative, Rebecca Lancaster. She expressed her concerns to Lancaster, explaining all that had transpired. Lancaster then discussed the matter with Gerald Haskel, the union's executive director, and they both decided Christensen should no longer meet with Beck alone. They both began attending what would have otherwise been one-on-one meetings between Beck and Christensen.

¶17 Around this same time, in September 2016, Beck became concerned with overtime hours that Christensen had recorded while working from home. He drafted a Performance Improvement Plan and presented it to Christensen at her next one-on-one meeting with Beck, which the union representatives also attended.

¶18 On November 1, 2016, Lancaster and Haskel met with Beck's supervisor, Rory Payne, to report Beck's inappropriate behavior. Payne acknowledged that the behavior they described constituted sexual harassment. However, even though County policy required supervisors to report complaints of sexual harassment, Payne never reported Christensen's complaints to the County's human resources department for investigation. Instead, Payne gave Beck a heads up that Christensen had lodged a complaint against him—despite the fact that County policy prohibited him from doing so.

¶19 Payne also drafted an email intended for Christensen, criticizing her for discussing Beck's behavior with other employees. However, he did not send it to Christensen. Instead—apparently

by mistake—he sent it only to Beck.[2] The email began: "Theresa, On November 1, 2016 I had the privilege to meet with Gerald Haskel and Ray Lancaster to discuss ongoing difficulties with your supervisor Brian Beck . . . ." Payne wrote that Christensen had been overheard discussing Beck's behavior with a coworker and warned her against the perils of inter-office gossip: "True or not, sharing something this salacious in the office shows very poor regard for others, creates an unpleasant workplace for those involved and may be in violation of County policy 3-300: Standards of Conduct." Payne then advised that speaking directly "with the person [with whom] you are having the difficulty" is a far superior approach. Payne offered to act as a mediator or suggested that Christensen "reach out to HR directly."

¶20 Payne conceded that it was not appropriate for Beck to continue acting as Christensen's supervisor following her complaints. So he moved Beck's office further away from Christensen's. And he instructed Beck to no longer meet with Christensen alone. But he did not follow through in assigning Christensen a new supervisor. Beck remained Christensen's supervisor and his too-close-for-comfort monitoring persisted.

¶21 On November 8, 2016, Beck told Christensen that she would need to begin swiping her badge each time she arrived at work, left for lunch, returned from lunch, and left for the day. Christensen believed the rule singled her out, since others in the office were not required to do the same. Svetlana Bryner noted that "for a while, [Christensen] was the only one who needed to swipe her badge," and recalled that, "We were walking one day in the hallway and she forgot to swipe her badge, and she almost, like, was in tears and ran back to the door. So she—she swiped her badge."

¶22 On December 20, 2016, Beck called Christensen into his office for a one-on-one meeting, with little warning. No one else was present. He proceeded to deliver Christensen's yearly evaluation, which would determine whether Christensen would receive a 3% raise in January. She needed a minimum score of 3 out of 5 to receive the raise. Beck gave Christensen a 2.15.

¶23 Christensen filed a grievance and requested review of Beck's evaluation. Her appeal was successful, and on January 13,

---

[2] Payne testified that he did not send the email to Christensen and the recipient line of the email confirms this.

2017, Payne directed Beck to raise Christensen's score to a 3. Beck did so begrudgingly. This made Christensen eligible for her annual raise.

¶24 On January 17, 2017, Christensen filed an equal employment opportunity (EEO) complaint with the County, alleging sexual harassment and retaliation. That same day, Beck issued a written warning to Christensen, stating that she had altered her work schedule without prior approval in September, October, and December 2016. However, it is unclear from the record whether the EEO complaint or the warning happened first.[3]

¶25 Beck's scrutiny of Christensen persisted, and she continued to perceive that she was singled out for criticism. For example, on January 24, 2017, Christensen attended a staff meeting at which Beck displayed copies of Christensen's work product to the staff, highlighting her errors as examples of what *not* to do. Later that month, Christensen walked into her office and found a large stack of papers on her desk. It appeared to her that Beck had pulled all her purchasing cards from 2016 and had reviewed them "with a fine[-toothed] comb" looking for any errors she may have made. Christensen saw that Beck had marked any errors on her purchasing cards in red, and that no one else's cards had been marked up.

¶26 As a result of these incidents, Christensen's mental and physical health deteriorated. She explained that the stress began "affecting [her] relationship at home with [her] husband." She "was crying every day" and felt she "needed to talk to someone because of [her] stress and [her] anger." She began seeing a counselor. Christensen's work stress also began to manifest physically in the form of "[s]evere headaches." "I couldn't concentrate," Christensen lamented, "I was a mess."

¶27 The EEO office interviewed Christensen in February 2017. But when she had not heard back from them a month and a half later, she filed a complaint against the County with the Utah

---

[3] The Board found that the EEO complaint was made "early in January 2017," and its findings appear to reflect a belief that the EEO complaint predated Beck's written warning to Christensen. But the EEO complaint is dated January 17, 2017, the same day Christensen received Beck's warning. And Christensen testified that she believes she submitted the complaint first, then "got this written warning later" that day.

Antidiscrimination and Labor Division (Division). She alleged that the County had subjected her to discrimination, sexual harassment, retaliation, and constructive discharge under the UAA.

¶28 Shortly thereafter, Christensen took leave from her job under the Family and Medical Leave Act (FMLA) at her doctor's recommendation. She exhausted all the vacation and sick leave that she had accumulated during her career with the County. When her leave balance was depleted, she decided to retire early rather than return to the office. Because she was just shy of the requirements for receiving a full pension, she used money from her retirement plan to buy out the difference.

¶29 On August 22, 2018, the County issued Beck a notice of Intent to Terminate stemming from instances of inappropriate workplace behavior with various other employees. Beck ultimately resigned in lieu of termination.

*Labor Commission Decisions*

¶30 Ultimately, the Division issued an order finding "no reasonable cause" for Christensen's claims of discrimination and retaliation. Christensen appealed to the Labor Commission. And the case eventually went before an ALJ (original ALJ) for an evidentiary hearing. Christensen includes in her briefing some statements that she attributes to the original ALJ.[4] According to Christensen's briefing, the original ALJ said,

> Right now, it appears to me that the county knew on November 1st, 2016 that petitioner believed Mr. Beck had engaged in sexual harassment. The county did not investigate. In fact, the county did not take steps to shield petitioner from her alleged harasser. In fact, the county revealed to the alleged harasser what petitioner had said about him and then left her directly subject to his control. I consider that at this point to be an adverse employment action.

---

[4] The record citations that Christensen includes for these statements do not coincide with the Bates numbering of the appellate record. And we have been unable to confirm that the original ALJ made these statements. However, the County has not claimed that Christensen is misquoting the original ALJ, so we assume for purposes of this appeal that Christensen's briefing on this point is accurate.

She continued,

> And if the county does not articulate a valid business reason for ignoring the complaint and leaving her subject to an alleged—allegedly abusive situation, then the burden doesn't even shift back to her to demonstrate (inaudible). That's where I am right now.

Christensen perceived these statements to be very favorable to her case.

¶31  However, after the hearing, the parties received notice that the original ALJ had been replaced by a different ALJ who, without conducting any additional proceedings, was to issue factual findings, conclusions of law, and an order in the matter. Although the replacement ALJ was not present at the original hearing, he had access to a video recording of all testimony and argument presented there. After reviewing the recording, the replacement ALJ issued an order concluding that Christensen had failed to prove her claims of discrimination, retaliation, and constructive discharge.

¶32 With respect to the retaliation claim, the ALJ used the burden-shifting framework established by the U.S. Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), and endorsed by the court of appeals in the retaliation context, *Viktron/Lika v. Labor Comm'n*, 38 P.3d 993 (Utah Ct. App. 2001). Per the first step of *McDonnell Douglas*, the ALJ determined that Christensen had established a prima facie claim of retaliation by showing that: 1) she had engaged in an activity protected by the UAA when her union representatives reported her complaints about Beck to the County on November 1, 2016; 2) after the protected activity, the County took an adverse action against her when Payne notified Beck of her complaints by email and when she received a written warning regarding unapproved schedule changes on the same day she filed her EEO complaint; and 3) there was a causal connection between her activity and the adverse action, because her activity was closely followed by the adverse action.

¶33 The burden then shifted to the County to articulate a legitimate, non-retaliatory reason for the adverse employment actions. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999); *see also Viktron/Lika*, 38 P.3d at 995. The ALJ concluded that the County met this step, finding that Payne had mistakenly sent the email about Christensen's complaint to Beck, and that the

written warning was for the purpose of correcting Christensen's failure to obtain approval before altering her work schedule.

¶34 Finally, the ALJ assessed whether Christensen had shown that the reasons given by the County for its actions were pretextual. *See McDonnell Douglas*, 411 U.S. at 804. It determined that Christensen had failed to do so. And it dismissed Christensen's retaliation claim on that basis.

¶35 Christensen moved the Board to review the ALJ's order. She challenged the substitution of the original ALJ and the replacement ALJ's determinations that she did not suffer retaliation and was not constructively discharged. She did not, however, challenge the ALJ's rejection of her discrimination claim.

¶36 Although the Board acknowledged that the post-hearing replacement of an ALJ was "unusual," it concluded that Christensen had not shown that the substitution prejudiced her. The Board also agreed with the ALJ that Christensen failed to show she was constructively discharged. But the Board set aside the ALJ's decision dismissing Christensen's retaliation claim. Applying the *McDonnell Douglas* framework for itself, the Board concluded that Christensen had shown that the County's rationale for its adverse actions was pretextual. It reversed the ALJ's dismissal of her retaliation claim and remanded the matter back to the ALJ to determine an appropriate remedy for the retaliation Christensen had suffered.

¶37 On remand, the ALJ crafted a damages award based on the remedies provided in the UAA. Relevant here, it denied her request that her attorney fees be included in the award.

¶38 Both Christensen and the County asked the Board to review the ALJ's decision. On review, the Board rescinded some of the damages award, but it found "that most of the relief awarded to Christensen was appropriate." Relevant here, it upheld the ALJ's denial of attorney fees. Both the Board and the ALJ reasoned that an attorney fee award would violate the Utah Constitution based on their interpretation of *Injured Workers Ass'n of Utah v. State*, 2016 UT 21, 374 P.3d 14, in which this court struck down the Labor Commission's attorney fee schedule in workers' compensation cases because it usurped this court's constitutional authority to regulate the practice of law.

¶39 Christensen and the County each appealed aspects of the Board's decision. Christensen argued, among other things, that the

Labor Commission erred in refusing to disclose why the original ALJ was removed from the case. She also asserted that the Board had incorrectly declined to award her attorney fees based on a misinterpretation of *Injured Workers*. And she challenged the use of the *McDonnell Douglas* burden-shifting framework throughout the administrative proceeding, arguing that the standard should be used only in the summary judgment context. Instead, Christensen urged the court of appeals to adopt what she referred to as a "but-for" causation standard.

¶40 The County challenged the Board's determination that it retaliated against Christensen in violation of the UAA. The County claimed that the Board had failed to explain the basis for any finding of "adverse action" as required by the definition of "retaliate" in section 34A-5-102(1)(y) of the UAA. It argued that the term should be defined as requiring the alteration of employment status or the creation of conditions so severe and pervasive as to alter the conditions of the victim's employment and create an abusive work environment.

*Court of Appeals Opinion*

¶41 A majority of the panel of the court of appeals affirmed in part and reversed in part. *Christensen v. Lab. Comm'n*, 2023 UT App 100, 536 P.3d 1114. First, the court of appeals acknowledged Christensen's proposal for a "but-for" standard instead of the *McDonnell Douglas* test, and it conceded her argument against *McDonnell Douglas* "ha[d] some force." *Id.* ¶ 22 n.6. But the court observed that the Board had, nonetheless, applied the *McDonnell Douglas* test in Christensen's favor in reviving her retaliation claim. Because Christensen was not prejudiced by the test, since she had succeeded in pursuing her retaliation claim under the *McDonnell Douglas* framework, the majority declined to address the issue on the merits. *Id.*

¶42 In the same vein, the court of appeals determined that Christensen had not been prejudiced by the substitution of the original ALJ because she ultimately prevailed on her retaliation claim. *Id.* ¶ 19 n.4. Because Christensen could not "show that she suffered prejudice as a result of the substitution," the court of appeals "d[id] not address this argument further." *Id.*

¶43 And the court ultimately affirmed the Board's finding of retaliation. Regarding the County's challenge, it acknowledged that there was no statutory definition for the term "adverse action," and that "Utah's appellate courts have not fully explored the

meaning of the phrase in the retaliation context." *Id.* ¶ 24. So the court looked to federal law addressing the same issue in the Title VII retaliation context. The court found the U.S. Supreme Court's analysis in *Burlington Northern & Santa Fe Railway v. White*, 548 U.S. 53 (2006), to be persuasive. That case defines an "adverse action" as one which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (cleaned up). The court adopted this standard, noting favorably the *Burlington* court's observation that the purpose of anti-retaliation statutes is "to prevent employer interference with unfettered access to . . . remedial mechanisms . . . by prohibiting employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." *Christensen*, 2023 UT App 100, ¶ 28 (quoting *Burlington*, 548 U.S. at 69).

¶44   In the order on review, the Board itself had not referenced the *Burlington* standard—it looked only to see if the alleged retaliatory conduct amounted to "a material change in the terms, privileges, and conditions of Christensen's employment." The court of appeals nonetheless declared: "We cannot find fault with the Board's determination that these actions could be considered 'adverse actions' that materially affected the 'terms, privileges, and conditions' of Christensen's employment because they altered the conditions of her employment in a way that had the potential to 'dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Id.* ¶ 30 (quoting *Burlington*, 548 U.S. at 69 (cleaned up)).

¶45   As to attorney fees, the court observed that section 34A-5-107(8) expressly authorizes an award of attorney fees to an employee who prevails on a claim of a discriminatory or prohibited employment practice. It acknowledged that *Injured Workers* had invalidated a provision that "gave the Labor Commission full authority to regulate and fix attorney fees and to set limits on the fees attorneys could charge for their services." *Id.* ¶ 33 (citing *Injured Workers*, 2016 UT 21, ¶ 33). It also interpreted *Injured Workers* to preclude the Labor Commission from assessing the reasonableness of individual attorney fee awards—this based on *Injured Workers*' declaration that "the regulation of attorney fees falls squarely within the practice of law" which is within the "plenary authority" of the Utah Supreme Court. *Id.* ¶ 51 (cleaned up).

¶46   But the court also observed that *Injured Workers* explicitly stated that its ruling was "limited to legislative attempts to regulate

the attorney-client relationship . . . [and did] not foreclos[e] the legislature's ability to designate statutory attorney-fee awards." *Id.* ¶ 27 (quoting *Injured Workers*, 2016 UT 21, ¶ 34 n.7). So the court concluded that *Injured Workers* did not go so far as to completely preclude an award of attorney fees by the Commission under the UAA. *Id.* Instead, it reasoned the Commission was required to award the amount of fees charged by a successful complainant's counsel—so long as the fees were related to the case—and that any concerns about reasonableness could be addressed through complaints to the Office of Processional Conduct for violation of rule 1.5 of the Rules of Professional Conduct. *Id.*

¶47 Then-Judge Pohlman concurred in part and dissented in part. She agreed with the majority's adoption of the *Burlington* standard, but disagreed that it should apply that standard in the first instance because the Board itself had never applied it. *Id.* ¶ 65 (Pohlman, J., concurring in part and dissenting in part). She noted that remand would obviate the need to address the other issues raised by the parties, but she chose to address the attorney-fee issue for the sake of "urg[ing] [the] supreme court, if given the opportunity, to address the application of *Injured Workers* . . . ." *Id.* ¶ 66. To that end, she acknowledged the difficulty presented by any attempt to "square th[e] two statements" in *Injured Workers* regarding the court's plenary authority to regulate the practice of law and the legislature's retained authority to designate statutory fee awards. *Id.* ¶ 74. While she did "not question the logic of th[e] resolution" reached by the panel majority, she did "question how th[at] resolution [would] work in practice" and "worr[ied] that some confusion, if not unfairness, may be introduced into the process if that reasonableness determination is not part of the equation." *Id.* ¶ 75.

¶48 The County petitioned for certiorari and Christensen filed a conditional cross-petition. We granted both. We have jurisdiction under Utah Code section 78A-3-102(3)(a).

## STANDARD OF REVIEW

¶49 "On certiorari, this court reviews the decision of the court of appeals for correctness, giving no deference to its conclusions of law." *State v. Baker*, 2010 UT 18, ¶ 7, 229 P.3d 650.

## ANALYSIS

¶50 We address the following issues raised by the parties.

¶51 Initially, we agree with the court of appeals that *Burlington* sets out the proper standard for an "adverse action" in retaliation claims under the UAA. Accordingly, we hold that an adverse action, within the meaning of the UAA, is an action that would likely dissuade a reasonable worker from making or supporting a charge of discrimination. *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006).

¶52 But we conclude that the court of appeals should not have applied this standard in the first instance. Because the Board did not apply the *Burlington* standard to Christensen's claim and did not make sufficient factual findings to fully address the standard, the Board's decision cannot be upheld based on the existing record. Accordingly, we reverse the court of appeals' conclusion that Christensen suffered retaliation and remand that issue back to the Board.

¶53 Next, because we remand, we take up Christensen's argument that the *McDonnell Douglas* framework should not be used in evidentiary hearings in the Labor Commission. We conclude that there is no problem with ALJs or the Board employing the familiar burden-shifting framework in adjudicating claims under the UAA, as long as they confine it to its proper role. The framework orders the production of evidence in a way intended to "sharpen[] the inquiry into the elusive factual question of intentional discrimination" or retaliation. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) (cleaned up). However, the *McDonnell Douglas* steps do not themselves constitute the elements of a retaliation or discrimination claim. Rather, the steps are intended to assist the factfinder in determining the ultimate question of retaliation or discrimination.

¶54 Then, we clarify that our decision in *Injured Workers* does not preclude the Labor Commission from awarding attorney fees under the UAA or from assessing the reasonableness of the amount requested.

¶55 And finally, we address Christensen's argument that she is entitled to know why the original ALJ in her case was replaced by a different ALJ. We reject Christensen's argument, because she does not identify a legal basis for obtaining this information or explain what remedy it might provide her.

¶56 We now turn to Christensen's retaliation claim.

I. RETALIATION

¶57 The UAA prohibits an employer from retaliating or discriminating against "a person otherwise qualified, because of" the person's membership in one of the protected groups identified in the statute. Utah Code § 34A-5-106(1)(a)(i). "[T]he legislature intended the [UAA] to address all manner of employment discrimination against any member of the specified protected groups . . . [and] the legislature included employer retaliation for complaining of employment discrimination within its definition of discrimination." *Retherford v. AT&T Commc'ns of Mountain States, Inc.*, 844 P.2d 949, 966 (Utah 1992).

¶58 The statute defines "retaliate" as "the taking of adverse action by an employer . . . against one of its employees . . . because the employee . . . opposes an employment practice prohibited under this chapter; or files charges, testifies, assists, or participates in any way in a proceeding, investigation, or hearing under this chapter." UTAH CODE § 34A-5-102(1)(y).

¶59 Thus, to prevail on a retaliation claim under the UAA, the statute requires a complainant to prove that: 1) the complainant engaged in protected opposition to discrimination or participated in a proceeding arising out of discrimination; 2) the employer took an adverse action against the employee; and 3) the employer took the action because the complainant engaged in the protected activity. *Id.*

¶60 Here, the court of appeals upheld the Board's determination that the County retaliated against Christensen. The County challenges this decision, arguing that, because the court of appeals applied a new legal standard in analyzing whether the County took an "adverse action" against Christensen, the court should have remanded rather than upholding the Board's decision.

*A. The Meaning of "Retaliation" and "Adverse Action"*

¶61 Although the UAA requires complainants to show that their employer took an "adverse action" against them, the statute does not define that term. The court of appeals noted that Utah appellate courts had yet to provide guidance on the meaning of this term, and it looked to federal precedent. *Christensen v. Lab. Comm'n*, 2023 UT App 100, ¶¶ 24–25, 536 P.3d 1114. The court of appeals conducted a thoughtful review of the U.S. Supreme Court's analysis of the meaning of "adverse action" in *Burlington Northern & Santa Fe Railway v. White*, 548 U.S. 53, 68 (2006), taking care to

assess whether the Court's conclusions in that case aligned with the language of the UAA. *Christensen*, 2023 UT App 100, ¶¶ 25–28.[5]

¶62 In *Burlington*, the Court held that for an adverse action to be actionable, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 548 U.S. at 68 (cleaned up). This holding encompasses several defining characteristics of an actionable adverse action.

¶63 Primarily, the Court addressed how *severe* an adverse action must be to constitute prohibited retaliation. It concluded that it must be materially adverse—in other words, harmful enough that it would likely dissuade a reasonable worker in the plaintiff's position from "making or supporting a charge of discrimination." *Id.* at 57. The Court reasoned that it was "important to separate significant from trivial harms" because "judicial standards for [discrimination] must filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.* at 68 (cleaned up). The Court observed that, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* Rather, the purpose of anti-retaliation statutes is to "prevent employer interference with unfettered access to . . . remedial mechanisms . . . by prohibiting employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." *Id.* (cleaned up). Thus, while "adverse action" could conceivably encompass a multitude of potentially undesirable actions, the Supreme Court concluded that to give rise to a claim of retaliation, the employer's action must be one that is materially adverse and

---

[5] In *Burlington*, the Supreme Court addressed whether, to be actionable, an adverse action must relate to the terms or conditions of employment and how severe the action must be. *Burlington N. & Santa Fe Ry v. White*, 548 U.S. 53, 59–61 (2006). In this case, the court of appeals adopted only the Court's holding regarding the latter question, severity, because the first question was not at issue. *Christensen v. Lab. Comm'n*, 2023 UT App 100, ¶¶ 25–26, 536 P.3d 1114. We also do not opine on the first question addressed by the *Burlington* Court.

therefore likely to dissuade a reasonable worker in the plaintiff's position from opposing discrimination. *Id.* at 67–68.

¶64 The Court also made clear that this standard is an *objective* one. It was careful to "refer to reactions of a *reasonable* employee" to ensure that the "standard for judging harm . . . be objective." *Id.* at 68. The Court did this because "[a]n objective standard is judicially administrable. It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Id.* at 68–69.

¶65 And finally, the Court explained that the standard is *general*. The Court rejected some courts' efforts to identify specific prohibited acts and voiced the standard in otherwise general terms because "[c]ontext matters." *Id.* at 69. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* (cleaned up). Thus, the Court observed that "an act that would be immaterial in some situations is material in others." *Id.* (cleaned up).

¶66 The court of appeals found this analysis persuasive and adopted *Burlington*'s definition of "adverse action" for use in the context of the UAA. We agree with the court of appeals.

¶67 In interpreting the meaning of "adverse action," we first note that the basic definition of the term is straightforward. Black's Law Dictionary defines it as "[a] decision or event that unfavorably affects a person, entity, or association. Common examples of adverse actions include a decrease in one's pay by an employer or a denial of credit by a lender." *Adverse Action*, BLACK'S LAW DICTIONARY (12th ed. 2024). But this broad definition does not tell us much about what unfavorable decisions or events constitute actionable retaliation in the employment discrimination context.

¶68 When interpreting provisions of the UAA, Utah courts often look to federal precedent interpreting Title VII for persuasive reasoning. *See Viktron/Lika v. Lab. Comm'n*, 38 P.3d 993, 995 (Utah Ct. App. 2001) ("Since the application of [the UAA's retaliation] provisions presents an issue of first impression in Utah, we find the substantial body of federal Title VII to be useful."). While federal Title VII caselaw is not binding on us, it is often useful because legislative history "reveal[s] that the [UAA] was modeled after Title VII of the Civil Rights Act of 1964." *Gottling v. P.R. Inc.*, 2002 UT 95, ¶ 16, 61 P.3d 989; *see also Kunej v. Lab. Comm'n*, 2013 UT App

172, ¶ 5 n.1, 306 P.3d 855 (explaining that the UAA was "modeled after Title VII of the Civil Rights Act and Utah courts have adopted a framework for analyzing [UAA] claims that mirrors the Title VII inquiry" (cleaned up)). And there is an abundance of federal caselaw interpreting Title VII. So when we face a novel question about the UAA, we are likely to find precedent on point in the "substantial body of federal Title VII law." *Viktron/Lika*, 38 P.3d at 995.

¶69 In doing so, however, we must keep the language of the UAA top of mind and ensure that the federal precedent we consult assists us in interpreting the specific language of our statute. In the context of retaliation claims, the court of appeals has observed that the retaliation provisions of the UAA, "in effect, set forth the same elements as are required in a federal Title VII retaliation claim." *Id.* We agree; however, we note that the language of the retaliation provisions in Title VII and the UAA differs in some respects.

¶70 As discussed, the UAA retaliation provision specifically states that an employer may not "retaliate against" an employee, UTAH CODE § 34A-5-106(1)(a)(i), and then defines retaliate as "the taking of adverse action by an employer . . . against one of its employees . . . because the employee . . . (i) opposes an employment practice prohibited under [the UAA]; or (ii) files charges, testifies, assists, or participates in any way in a proceeding, investigation, or hearing under [the UAA]," *id.* § 34A-5-102(1)(y).

¶71 In contrast, Title VII does not use the words "retaliate" or "adverse action." Instead, Title VII reads: "It shall be an unlawful employment practice for an employer to *discriminate* against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a) (emphasis added). So, where the UAA uses the word "retaliate," Title VII uses the more general "discriminate." And federally, the phrase "adverse action" does not appear in Title VII; rather, it comes from caselaw.

¶72 But in this instance, this differing language does not dissuade us from looking to *Burlington* to assist us in interpreting the meaning of adverse action in the UAA. This is because *Burlington* (and the federal precedent that preceded it) has interpreted Title VII retaliation in a way that corresponds with the language of the UAA. Thus, this is an unusual occasion where federal caselaw more closely tracks the language of our statute than it does Title VII.

¶73 And when the term "adverse action" was added to the UAA, federal caselaw interpreting Title VII retaliation claims employed that phrase—even though it did not appear in the language of Title VII. The UAA was first enacted in 1965. But the inclusion of "retaliation" as a prohibited employment practice and the definition of it as an "adverse action" against an employee who opposed discrimination was added to the UAA in 1985. Laws 1985, c. 189, § 1, 3; UTAH CODE § 34-35-2(15) (1985) (defining "Retaliate" as "the taking of adverse action by an employer . . . against one of its employees . . . because he has opposed any employment practice prohibited under this chapter or because he has filed charges, testified, assisted, or participated in any way in any proceeding, investigation, or hearing under this chapter"); UTAH CODE § 34-35-6(1)(a) (1985) (stating that it is "a discriminatory or prohibited employment practice . . . for an employer to . . . retaliate against . . . any person otherwise qualified because of" membership in a protected class). And by 1985, federal caselaw interpreting Title VII retaliation claims used the term "adverse action." *See, e.g.*, *Neely v. Blumenthal*, 458 F. Supp. 945, 956 (D.D.C. 1978) (explaining that the language of Title VII "prohibits employers from taking *adverse action* against an employee" in retaliation for opposing an unlawful employment practice (emphasis added)); *Gunther v. Washington Cnty.*, 623 F.2d 1303, 1314, (9th Cir. 1979) ("In order to establish a prima facie violation of [Title VII], the plaintiffs must show more than that they protested practices contrary to Title VII and that they were subject to *adverse action* by their employer." (emphasis added)); *Walker v. Ford Motor Co.*, 684 F.2d 1355, 1359 & n.3 (11th Cir. 1982) (defining the second element of a prima facie case as "an adverse employment action" under "the traditional three-step proof in Title-VII cases").

¶74 As federal precedent regarding retaliation developed over time, federal courts advanced different meanings for adverse action. *See, e.g., Ray v. Henderson*, 217 F.3d 1234, 1237 (9th Cir. 2000) (joining the First, Seventh, Tenth, Eleventh, and D.C. Circuits at the time by holding that "an adverse employment action is adverse treatment that is reasonably likely to deter employees from engaging in protected activity"); *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997) (holding that conduct rises to the level of an "adverse employment action" only if it alters the employee's compensation, terms, conditions, or privileges of employment); *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707–09 (5th Cir. 1997) (holding, consistent with the Eight Circuit, that only "ultimate

19

employment decisions" can constitute "adverse employment actions").

¶75 The Supreme Court settled the issue when it decided *Burlington*. And we agree with the court of appeals that the Court's definition of adverse action in that case informs, and is consistent with, the use of the term in the UAA. The UAA forbids employers from retaliating against employees because they oppose discrimination in the workplace. It follows that the adverse actions the statute is concerned with are those that are severe enough to be material to a reasonable employee's decision to oppose discrimination. A general standard correlates with the language of the provision as well. The UAA does not list specific actions that will be deemed adverse. Rather, it generally prohibits those adverse actions that are motivated by an employer's desire to retaliate against an employee for opposing discrimination.

¶76 Accordingly, we agree with the court of appeals and hold that in the context of a retaliation claim under the UAA, an adverse action is an action that would likely dissuade a reasonable worker in the plaintiff's position from making or supporting a charge of discrimination. *Burlington*, 548 U.S. at 57.

¶77 However, we conclude that instead of applying the new standard itself, the court should have remanded the case back to the Board so the Board could apply the *Burlington* standard in the first instance.

¶78 When an appellate court concludes that a new or clarified legal standard is applicable in a given case, we have a measure of discretion in determining how to ultimately dispose of the case. UTAH R. APP. P. 30(a).[6]

---

[6] Utah Rule of Appellate Procedure 30(a) describes the ways an appellate court may decide a civil case. It provides:

> "The court may reverse, affirm, modify, or otherwise dispose of any appealed order or judgment. If the findings of fact in a case are incomplete, the court may order the trial court or agency to supplement, modify, or complete the findings to make them conform to the issues presented and the facts as found from the evidence and may direct the trial court or agency to enter judgment in accordance with the findings as revised. The court may also order a

(continued . . .)

¶79 When an appellate court addresses a question of first impression and adopts a new legal standard, it may remand the case back to the trial court to apply the new standard, or it may apply the new standard itself. *Dipoma v. McPhie*, 2001 UT 61, ¶ 18, 29 P.3d 1225 (noting that an appellate court may affirm a judgment "if it is sustainable on any legal ground or theory apparent on the record, even though such ground or theory differs from that stated by the trial court to be the basis of its ruling or action" (cleaned up)). But the latter option works only if the factual record in the trial court is sufficient to accommodate the new standard—in other words, only if the resolution is apparent on the record. If necessary factual findings do not exist because the trial court was not operating under the new standard, a remand is usually in order. *See State v. Harding*, 2011 UT 78, ¶ 39, 282 P.3d 31 (noting that "remand is appropriate so that the district court may enter particularized findings of fact" after announcing a new rule); *State v. Antonio Lujan*, 2020 UT 5, ¶ 8, 459 P.3d 992 (noting that when "we have substantially reformed the law in [a] field," we are "inclined to remand to the district court to allow it to apply our new standards to the facts").

¶80 Here, we agree with then-Judge Pohlman's separate opinion that "given the fact-intensive nature of this assessment and the limited extent of the Board's findings," the Board did not find sufficient facts for us to apply the *Burlington* standard on this record. *Christensen v. Lab. Comm'n*, 2023 UT App 100, ¶ 69, 536 P.3d 1114 (Pohlman, J., concurring in part and dissenting in part). As she explained,

> It is difficult to know how to assess the Board's statement that [Beck] followed Christensen and closely monitored her, because there are no findings in either the ALJ's or the Board's decisions about her being followed or describing how and when she was closely monitored. Similarly, without additional context, it is not apparent to me why the sharing of two documents containing Christensen's mistakes,

new trial or further proceedings to be conducted. If a new trial is granted, the court may pass upon and determine all questions of law involved in the case presented upon the appeal and necessary to the final determination of the case."
Utah R. App. P. 30(a).

reviewing her purchasing activity from the prior year, and her observation that errors were marked in her files necessarily would have dissuaded a reasonable worker from making or supporting a charge of discrimination.

*Id.* ¶ 70 (cleaned up).

¶81 Because the record and the Board's analysis were not developed with the *Burlington* standard in mind, it is not apparent on the record that its retaliation determination should be upheld. Accordingly, we reverse the court of appeals' decision upholding the Board's ruling on this point and remand for the Board to apply the standard itself, and to find additional facts as it deems necessary.

### B. *The Role of* McDonnell Douglas

¶82 Christensen next argues that the Labor Commission should not apply the *McDonnell Douglas* burden-shifting framework at evidentiary hearings, but should instead apply a "modified but-for analysis."[7] The court of appeals did not address this argument because it affirmed the Board's conclusion that Christensen suffered retaliation under the *McDonnell Douglas* test, and it had no interest in "rendering advisory opinions." *Christensen*, 2023 UT App 100, ¶ 22 n.6. However, because we remand the retaliation claim for further review, we take this opportunity to elucidate the proper role of the *McDonnell Douglas* burden-shifting framework.

¶83 The *McDonnell Douglas* framework was created by the Supreme Court in its third-ever Title VII decision, *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). That decision "established an allocation of the burden of production and an order for the presentation of proof," in Title VII discrimination claims. *St. Mary's*

---

[7] In the Title VII retaliation context, this "but for" terminology comes from the Supreme Court's holding in *University of Texas Southwestern Medical Center v. Nassar*, that the employer's desire to retaliate must be a "but-for" cause of the adverse action against the employee, as opposed to a "motivating factor" for the adverse action. 570 U.S. 338, 352 (2013). But here, the parties have not raised or briefed any issue related to the standard of causation that should apply in this case. And we express no opinion on the applicability of *Nassar* to the UAA, as that is not before us.

*Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) (citing *McDonnell Douglas*, 411 U.S. 792). The framework has been described as a "three-step . . . minuet." *See e.g., Etienne v. Spanish Lake Truck & Casino Plaza, LLC*, 778 F.3d 473, 475 (5th Cir. 2015) (cleaned up). The plaintiff must first "establish[] a prima facie case by producing enough evidence to support an inference of discriminatory [or retaliatory] motive." *See Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 308–09 (2025) (cleaned up); *St. Mary's*, 509 U.S. at 506; *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff does this, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse action taken against the plaintiff. *Ames*, 605 at 308 (cleaned up); *see also Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 245–55 (1981) (clarifying that during the second stage of the *McDonnell Douglas* analysis, a defendant must "articulate" a legitimate, nondiscriminatory reason for an adverse employment action through admissible evidence (cleaned up)). If the defendant can do so, the burden finally shifts back to the plaintiff to prove that the defendant's articulated reason is a pretext for legally prohibited acts of discrimination or retaliation. *McDonnell Douglas*, 411 U.S. at 804; *see also Ames*, 605 U.S. at 309.

¶84 Over the years, courts have applied *McDonnell Douglas* in a variety of settings. Originally, the Supreme Court developed the burden-shifting framework for use in cases arising under Title VII. 411 U.S. at 793–94. But courts have come to use it in analyzing claims under a variety of other statutes, such as the Americans with Disabilities Act, the Age Discrimination in Employment Act of 1967, and discrimination cases brought under 42 U.S.C. sections 1983 and 1981. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49 (2003) (ADA); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (ADEA); *St. Mary's*, 509 U.S. at 506 n.1 (42 U.S.C. § 1983); *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127 (2d Cir. 2013) (42 U.S.C. § 1981). And many states have done the same for claims under state antidiscrimination statutes. *See, e.g., Hatheway v. Bd. of Regents of Univ. of Idaho*, 310 P.3d 315, 323 (Idaho 2013); *Harris v. City of Santa Monica*, 294 P.3d 49, 54 (Cal. 2013); *Hooper v. Norwest Priv. Mortg. Banking*, 632 N.W.2d 534, 548 (Minn. 2001).

¶85 We have done so as well. *See, e.g., University of Utah v. Industrial Com'n of Utah*, 736 P.2d 630 (Utah 1987); *Sheikh v. Dep't of Public Safety*, 904 P.2d 1103 (Utah Ct. App. 1995); *Viktron/Lika v. Lab. Comm'n*, 38 P.3d 993 (Utah Ct. App. 2001); *Hexcel Corp. v. Labor Comm'n*, 2022 UT App 52, 551 P.3d 310; *Christensen*, 2023 UT App

100. And the ALJ and the Board looked to the *McDonnell Douglas* framework in this case.

¶86 The burden-shifting procedure developed because "[e]arly on . . . it became clear that when only circumstantial evidence was available, figuring out whether the *actual* reason that an employer fired or disciplined an employee was illegal discrimination [or retaliation] was difficult and 'elusive.'" *Tynes v. Florida Dep't of Juv. Just.*, 88 F.4th 939, 944 (11th Cir. 2023) (quoting *Burdine*, 450 U.S. at 255 n.8), *cert. denied*, 145 S. Ct. 154 (2024). "In a Title VII case, the allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination." *Burdine*, U.S. at 255 n.8.

¶87 The Supreme Court has explained that the *McDonnell Douglas* framework "was never intended to be rigid, mechanized or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *U.S. Postal Ser. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983). Indeed, in *McDonnell Douglas* itself, the Court observed that "[t]he facts necessarily will vary in Title VII cases, and the specification . . . of the prima facie proof required from [the] respondent is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas,* 411 U.S. at 802 n.13. And there may be no need to use the framework in some cases—for example, when the plaintiff adduces direct evidence of discrimination.[8]

---

[8] The *McDonnell Douglas* procedure may not be necessary if a plaintiff offers direct, rather than circumstantial, evidence of retaliation or discrimination. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination."). Accordingly, if a plaintiff wishes to proceed straight to proof of the elements of a claim with direct evidence, the *McDonnell Douglas* procedure is not mandatory. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013) ("When a plaintiff offers direct evidence of discrimination . . . , her claim may move forward without being subjected to the burden-shifting framework set forth in *McDonnell Douglas* . . . ."). We set forth the elements of a retaliation claim below. *Infra* at ¶ 96.

¶88 Additionally, it is important to understand that *McDonnell Douglas* "is not a set of elements that the employee must prove—either to survive summary judgment or prevail at trial." *Tynes*, 88 F.4th at 941. Rather, it is a "procedural device, designed only to establish an order of proof and production." *St. Mary's*, 509 U.S. at 521; *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002) (establishing that the *McDonnell Douglas* prima facie case "is an evidentiary standard, not a pleading requirement"). The Eleventh Circuit recently addressed the "all-too-common confusion in employment discrimination suits: whether the evidentiary framework set out in *McDonnell Douglas* is a stand-in for the ultimate question of liability in Title VII discrimination cases." *Tynes*, 88 F.4th at 941. It explained, "It is not. Properly understood, *McDonnell Douglas* is an evidentiary framework that shifts the burden of production between the parties to figure out if the true reason for an adverse employment action was the employee's [membership in a protected group]." *Id.*

¶89 Walking through the framework in the context of a UAA retaliation claim, we begin with the prima facie case. Initially, the plaintiff bears the burden of establishing a prima facie case of retaliation by showing that: 1) the plaintiff engaged in protected opposition to discrimination or participated in a proceeding arising out of discrimination; 2) the employer took an adverse action against the employee subsequent to the protected activity; and 3) there is a causal connection between the employee's activity and the employer's adverse action. *Viktron/Lika*, 38 P.3d at 995 (citing *Robbins v. Jefferson Cnty. Sch. Dist. R-1*, 186 F.3d 1253, 1258 (10th Cir. 1999)). Importantly, the prima facie case does not set out the elements of a retaliation claim.

¶90 Instead, if a plaintiff is able to adduce evidence of these facts, it creates a "presumption" that the employer unlawfully retaliated against the plaintiff. *St. Mary's*, 509 U.S. at 506. In this context, "to establish a 'presumption' is to say that a finding of the predicate fact[s] (here, the prima facie case) produces a required conclusion in the absence of explanation (here, the finding of unlawful discrimination)." *Id.* (cleaned up). The prima facie case "raises an inference of discrimination [or retaliation] only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Burdine*, 450 U.S. at 254 (cleaned up). Thus, the establishment of a prima facie case, in this context, creates "a legally mandatory,

rebuttable presumption."[9] *Id.* at 254 n.7 (explaining that *McDonnell Douglas* meant "the phrase 'prima facie case'" to mean "the establishment of a legally mandatory, rebuttable presumption").

¶91  If the plaintiff establishes this presumption of retaliation, the burden shifts to the defendant to rebut it by showing, through admissible evidence, "that the adverse employment actions were taken for a legitimate, nondiscriminatory [or nonretaliatory] reason." *St. Mary's*, 509 U.S. at 507 (cleaned up). The defendant must "clearly set forth the reasons" for the adverse action. *Burdine*, 450 U.S. at 255. And to successfully rebut the presumption of retaliation, "the explanation provided must be legally sufficient to justify a judgment for the defendant." *Id.* Importantly, however, the defendant's burden is one of production, not persuasion. *St. Mary's*, 509 U.S. at 507. "The ultimate burden of persuading the trier of fact that the defendant intentionally [retaliated] against the plaintiff remains at all times with the plaintiff." *Id.* at 518 (cleaned up).

¶92 Besides rebutting the presumption of retaliation, the second step serves another function. It "frame[s] the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Burdine*, 450 U.S. at 255–56. The burden then shifts back to the plaintiff for this purpose.

¶93 In the third and final step, the plaintiff has "the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision." *Id.* at 256. "This burden

---

[9] We agree with the Eleventh Circuit's observation that the confusion about the function of the prima facie case may derive from the Supreme Court's use of this term, in this context, "in a special sense." *Tynes v. Florida Dep't of Juv. Just.*, 88 F.4th 939, 945 (11th Cir. 2023) (cleaned up). As that court explained, "To be fair, the *McDonnell Douglas* court's terminology likely bears some responsibility for the continuing confusion on this point . . . . The Court itself has explained that although that phrase may sometimes 'describe the plaintiff's burden of producing enough evidence to permit the trier of fact to infer the fact at issue,' within the *McDonnell Douglas* framework the term 'prima facie case' has a different meaning—it marks 'the establishment of a legally mandatory, rebuttable presumption.'" *Id.* (quoting *Burdine*, 450 U.S. at 254 n.7).

now merges with the ultimate burden of persuading the court that she has been the victim of intentional [retaliation]." *Id.* At this point,

> The *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant. . . . The presumption, having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture. . . . [And] the trier of fact proceeds to decide the ultimate question: whether plaintiff has proven that the defendant intentionally [retaliated] against him.

*St. Mary's*, 509 U.S. at 510–11 (cleaned up); *see also Barrett v. Salt Lake Cnty.*, 754 F.3d 864, 867 (10th Cir. 2014) ("By this point in the proceedings the *McDonnell Douglas* proxy 'drops out' and we ask instead the dispositive underlying Title VII question: has the plaintiff presented enough evidence to warrant a jury finding that the adverse employment action taken against him was taken in retaliation for his protected civil rights activity?"); *Fallis v. Kerr-McGee Corp.*, 944 F.2d 743, 744 (10th Cir. 1991) (holding that the burden shifting framework has no relevance in post-trial motions for judgment as a matter of law).

¶94 Accordingly, in an evidentiary hearing before an ALJ, the judge may use the *McDonnell Douglas* framework as a "procedural device, designed only to establish an order of proof and production," *St. Mary's*, 509 U.S. at 521, which "sharpen[s] the inquiry into the elusive factual question of intentional [retaliation]," *id.* at 506 (cleaned up). And if the plaintiff makes a prima facie case of retaliation by a preponderance of the evidence, but the employer presents no legitimate reason for the adverse action against the plaintiff, the plaintiff will prevail as a matter of law because the employer has failed to rebut the presumption of unlawful retaliation. *Viktron/Lika*, 38 P.3d at 995.

¶95 However, once the employer has presented admissible evidence of legitimate, nonretaliatory reasons for the adverse action and the burden shifts back to the plaintiff, the *McDonnell Douglas* framework essentially "drops out." The plaintiff's burden to show that the employer's reasons are pretextual merges with the plaintiff's ultimate burden to prove that the real reason for the employer's actions was unlawful retaliation—in other words, that the employer took the adverse action against the plaintiff because the plaintiff engaged in protected opposition to discrimination. At this point, the trier of fact should consider all the evidence

presented by the parties regardless of the "step" at which it was produced. And the factfinder (and subsequent reviewing courts) "should not be distracted by the legal technicalities of *McDonnell Douglas* in reaching the ultimate issue of [retaliation]." *Whittington v. Nordam Grp., Inc.,* 429 F.3d 986, 993 (10th Cir. 2005).

¶96   Accordingly, at this final step, the ultimate question before the ALJ is simply whether the plaintiff has proven the core elements of a UAA retaliation claim by a preponderance of the evidence. Those elements are that: 1) the complainant engaged in protected opposition to discrimination or participated in a proceeding arising out of discrimination; [10] 2) the employer[11] took an adverse action against the employee; and 3) the employer took the action because the complainant engaged in the protected activity. UTAH CODE § 34A-5-102(1)(y)(i), (ii).

II.  ATTORNEY FEES

¶97   We now address the parties' arguments about the availability of attorney fees to a complaining party under the UAA. In the Labor Commission, the ALJ and the Board both declined to grant Christensen an attorney fee award even though she prevailed on her retaliation claim, and even though the UAA provides for attorney fees as a remedy available to a complaining party who proves the employer engaged in a discriminatory or prohibited employment practice. *See* UTAH CODE § 34A-5-107(8). The Board reasoned that a decision of this court, *Injured Workers Ass'n of Utah v. State,* 2016 UT 21, 374 P.3d 14, prevented it from making such an award.

¶98   On appeal, the court of appeals reversed, concluding that "[the ALJ's] and the Board's denials were based on an erroneous interpretation of *Injured Workers.*" *Christensen v. Lab. Comm'n,* 2023 UT App 100, ¶ 50, 536 P.3d 1114. The court of appeals ruled that the Labor Commission can award statutory attorney fees. *Id.* But it concluded that an ALJ cannot review the "reasonableness" of the fee request under the rationale of *Injured Workers. Id.* ¶ 55. The court

---

[10] Protected opposition or participation in a proceeding includes everything listed in Utah Code section 34A-5-102(1)(y)(i), (ii).

[11] In this test, the other entities listed in the UAA, including an "employment agency, labor organization, apprenticeship program, on-the-job training program, or vocational school" could be substituted for "employer," where applicable. UTAH CODE § 34A-5-102(1)(y).

of appeals suggested a workaround: the ALJ could grant attorney fees based on the complaining party's submitted affidavit, "without passing judgement on the reasonableness underlying those fees." *Id.*

¶99 Because this issue may come up again on remand, we take this opportunity to clarify that *Injured Workers* does not prevent the Labor Commission from awarding statutory attorney fees or from ensuring that the amount awarded is reasonable.

¶100 In *Injured Workers*, this court analyzed a statute that regulated and fixed the amount an attorney could charge a client in a workers' compensation case. *See* UTAH CODE § 34A-1-309. The statute granted the Labor Commission "full power to regulate and fix the fee charge of attorneys involved in workers' compensation cases." *Injured Workers*, 2016 UT 21, ¶ 5 (cleaned up). Using this delegation of power, the Labor Commission crafted a sliding-scale fee schedule and established an overall cap on the amount an attorney could charge for representing an injured worker. UTAH ADMIN. CODE R602-2-4(C)(3).

¶101 The Injured Workers Association of Utah challenged the statute and the Labor Commission's accompanying fee schedule as unconstitutional. On appeal, this court struck down the statute, concluding that "the regulation of attorney fees is included within the power to govern the practice of law," which the "Utah Supreme Court has plenary authority to govern." *Injured Workers*, 2016 UT 21, ¶¶ 3, 14. "Because the Utah Supreme Court is vested with exclusive inherent and constitutional authority to govern the practice of law—and the court cannot under the separation-of-powers doctrine delegate the regulation of attorney fees to the legislature or the Commission—we hold both the Commission's fee schedule and its authorizing statute unconstitutional." *Id.* ¶ 3.

¶102 Importantly, however, we emphasized that this holding did not impact the legislature's ability to provide statutory attorney fee awards. *Id.* ¶ 34 n.7. We explained, "We stress that this opinion is limited to legislative attempts to regulate the attorney-client relationship. We are not foreclosing the legislature's ability to designate statutory attorney fee awards." *Id.*

¶103 There is an important distinction between the statute that this court struck down in *Injured Workers* and statutes providing for attorney fee awards to prevailing parties. The statute in *Injured Workers* was unconstitutional because it regulated the attorney-client relationship. It controlled what a lawyer could charge a client

for representation in a workers' compensation case. But statutory attorney fee awards do not regulate what a lawyer can charge a client. They compensate a prevailing party for the fees the party has had to pay.

¶104 Further, an ALJ or the Board does not impinge on this court's authority to regulate the practice of law when it evaluates a request for an attorney fee award for reasonableness. When a court makes such an assessment, it is evaluating what amount is reasonable for the losing party to pay the prevailing party as compensation—not whether the prevailing party's lawyer charged the party a reasonable fee.

¶105 Accordingly, an ALJ or the Board should assess an attorney fee request for reasonableness just as any district court would. The "[c]alculation of reasonable attorney fees is in the sound discretion of the trial court." *Dixie State Bank v. Bracken*, 764 P.2d 985, 988 (Utah 1988). And a district "court's determination of reasonableness is not bound by the prevailing party's affidavit of expenses." *Amyx v. Columbia House Holdings, Inc.*, 2005 UT App 118, ¶ 3, 110 P.3d 176; *see also Bakowski v. Mountain States Steel, Inc.*, 2002 UT 62, ¶ 38, 52 P.3d 1179 ("[A] trial court is not required to adopt the prevailing party's assertion of what constitutes a reasonable attorney fee, even if the fee is supported by an affidavit."). The question of "what constitutes a reasonable fee is not necessarily controlled by any set formula." *Dixie State,* 764 P.2d at 989. A judge should consider a variety of factors, including,

> the difficulty of the litigation, the efficiency of the attorneys in presenting the case, the reasonableness of the number of hours spent on the case, the fee customarily charged in the locality for similar services, the amount involved in the case and the result attained, and the expertise and experience of the attorneys involved.

*Cabrera v. Cottrell*, 694 P.2d 622, 625 (Utah 1983); *see also Trayner v. Cushing*, 688 P.2d 856, 858 (Utah 1984) (noting that a court should consider "the relationship of the fee to the amount recovered, the novelty and difficulty of the issues involved, the overall result achieved and the necessity of initiating a lawsuit to vindicate [a party's] rights").

¶106 In sum, we clarify that *Injured Workers* does not prevent the Labor Commission from awarding attorney fees as a remedy

under the UAA or from assessing whether the amount of fees requested is reasonable.

III. ALJ REPLACEMENT

¶107 Finally, we address Christensen's contention that the Labor Commission erred in refusing to disclose why the original ALJ was removed from the case. The court of appeals ruled against Christensen on this issue because it concluded she could not show that the substitution prejudiced her. *See* UTAH CODE § 63G-4-403, (providing that a court shall grant relief "only if" it determines that a party has been "substantially prejudiced" by the agency's error). While we do not take issue with this conclusion, we choose to affirm on the ground that Christensen has not identified a legal basis to obtain information about why the original ALJ was substituted in her case.

¶108 As an initial matter, the Administrative Procedures Act (APA) permits an ALJ to be replaced during a proceeding. Utah's APA defines a "presiding officer" as "an individual . . . designated by the agency head, by the agency's rules, or by statute to conduct an adjudicative proceeding." *Id.* § 63G-4-103(1)(h)(i). The statute further specifies that "[i]f fairness to the parties is not compromised, an agency may substitute one presiding officer for another during any proceeding." *Id.* § 63G-4-103(1)(h)(ii). Although the Board itself described the substitution as "unusual," Utah's APA contemplates this scenario, noting that "[a] person who acts as a presiding officer at one phase of a proceeding need not continue as presiding officer through all phases of a proceeding." *Id.*

¶109 Additionally, Christensen has not identified any Utah statute, rule, or decision that provides a basis to require the Labor Commission to disclose the reason behind the replacement in this case. Therefore, we affirm the court of appeals and hold that the Labor Commission did not err in refusing to disclose why the original ALJ was replaced.

**CONCLUSION**

¶110 We agree with the court of appeals' adoption of the *Burlington* standard to determine the scope of an adverse action under the UAA. However, we conclude that the Board did not make sufficient factual findings to permit application of the *Burlington* standard on this record. We therefore reverse the court of appeals' decision upholding the Board's determination on this

point and remand the retaliation claim to the Board so it can apply the *Burlington* standard in the first instance and make additional factual findings as necessary.

¶111 In doing so, the ultimate question before the Board is whether Christensen has proven the elements of a retaliation claim by a preponderance of the evidence, not whether she has satisfied the steps of the *McDonnell Douglas* test.

¶112 Finally, if the Board concludes that Christensen should prevail on remand, nothing we said in *Injured Workers* prevents the Board from awarding Christensen her attorney fees and evaluating the amount she requests for reasonableness.

¶113 Accordingly, we affirm in part, reverse in part, and remand.

————————